## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORTH AMERICAN | : | |
| COMMUNICATIONS, INC., | : | No. 3:17-cv-157 |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| MICHAEL HERMAN, | : | |
| Defendant and | : | |
| Counterclaim-Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| NORTH AMERICAN | : | |
| COMMUNICATIONS, INC., | : | |
| ROBERT HERMAN and NICHOLAS | : | |
| ROBINSON | : | |
| Counterclaim- | : | |
| Defendants. | : | |

## <u>AMENDED COUNTERCLAIMS</u>

Michael Herman, through undersigned counsel and pursuant to Rule 15, submits these Amended Counterclaims against North American Communications, Inc. ("NAC"), Robert Herman and Nicholas Robinson pursuant to Rules 13(a) and (h).[1]

## <u>Jurisdiction and Venue</u>

1.      Counterclaim-Plaintiff MICHAEL HERMAN, ("Plaintiff" or "Michael Herman" or "Mr. Herman") is an individual residing in the City and County of San Diego, state of California.

2.      Counterclaim-Defendant NICHOLAS ROBINSON ("Nick Robinson") is an individual residing in the state of New York.

---

[1] Several of the below Counterclaims, in substance, have already been asserted in the case of *Herman v. NAC*, 3:17-cv-01769, pending in the U.S. District Court for the Southern District of California (SDCA). They are set forth herein in an abundance of caution given pending motions in the SDCA action. Their assertion here should not be read to prejudice the SDCA action and, if needed, once the motions in the SDCA action are resolved, Mr. Herman plans to voluntarily dismiss any overlapping claims here.

3.     Counterclaim-Defendant ROBERT HERMAN ("Rob Herman") is an individual residing in the Commonwealth of Pennsylvania and/or the state of Texas as he has homes in both locations and spends significant time in both locations.

4.     Counterclaim-Defendant NORTH AMERICAN COMMUNICATIONS, INC., ("NAC") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

5.     The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. §1332, as well as 28 U.S.C. §1367.  The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

6.     The Court has venue based on its January 25, 2018 Order and 28 U.S.C. §1391.

### Factual Background

7.     Counterclaim-Plaintiff, based on information and belief, alleges that, at all times herein alleged, Counterclaim-Defendants, and each of them, were acting as the agents, servants, employees, employers, conspirators, venturers, partners and/or subsidiaries of each other, and in doing the wrongful acts herein alleged, unless expressly indicated otherwise, were acting within the course and scope of such agency, relationship, arrangement and/or employment.

8.     Mr. Herman started NAC nearly four decades ago. Mike Herman grew NAC from a fledgling business to a company that, at its height, generated over $60,000,000 in yearly gross revenues.

9.     NAC has always been a family business – in actuality, a two-family business. The Hermans were one of those families with Rob Herman (Mike's son and the current President of NAC) taking the leadership role in the business when Mike stepped away from it; the Paltrows, led by Mike's long-time business partner Bob Paltrow, were the other family, with Bob's son-in-

law Nick Robinson now serving as CEO.

10.     Despite being one of the founders of NAC, by 2013, Mr. Herman owned only 1% of NAC's stock.  The 50% of stock belonging to the Herman side of the business was technically owned by a limited partnership (Wye Investments, LP). While Mr. Herman was a general/managing partner and controlled decision-making for the entity, he only held 1% of the Herman family's NAC shares with his children, including Rob Herman, holding the other 99%.[2]

11.     On the advice of counsel, in 2013, a decision was made that Mr. Herman and Mr. Paltrow should distance themselves from NAC. But, since NAC did not have a 401(k) or pension plan, without an arrangement with NAC, Mr. Herman stood to lose out financially on the business he had started, grown and led to success. Hence, the Retirement Agreement ("Retirement Agreement" or "Agreement") that is at the center of this litigation (a copy of which is attached as Exhibit A to the Amended Complaint) was executed in June 2013.

12.     Also, as part of this "distancing" process, Mr. Herman gave up his control of decision-making and his 1% ownership interest and right to dividends from Wye Investments. Rob Herman convinced Michael Herman and his siblings that it was best that all the NAC stock be transferred to him, which happened making Rob Herman a 50% owner in NAC.[3]

13.     Under the Retirement Agreement, Mr. Herman was to receive monthly payments in the form of Retirement Benefits of $130,000 for a period of ten years. The payment of these retirement payments and NAC's ability to make them was the consideration NAC was providing

---

[2]   As a general partner, Mr. Herman had a right to receive dividends paid by the partnership; limited partners had no such right.

[3]   Certain of Rob Herman's siblings are considering bringing an action against him based on what they believe was his deception in convincing them to transfer their ownership in NAC to him.

to Mr. Herman and, if NAC lacked the ability to make the payments, the transaction would not have been consummated. The Retirement Agreement does not prohibit Mr. Herman from engaging in efforts to purchase NAC or its stock.

14.     NAC made the required payments for ten months, then made half payments for four months, then stopped paying altogether starting in or about September 2014. No payment has been made since then and nearly $14,000,000 in total remains unpaid under the Retirement Agreement, including over $5,700,000 in missed/past due payments (not including interest). Based on information and belief, NAC did not place the Retirement Agreement payments owed to Mr. Herman on its balance sheet as a liability, evidencing its intent not to make the payments and which fact was not, and in the exercise of reasonable diligence could not have been, discovered until at the earliest August 2017.[4]

15.     When NAC stopped paying, NAC, via Rob Herman, represented to his father that this was because NAC did not have funds to pay him. He repeated the substance of that representation to his father on numerous occasions and gave false assurances that NAC would eventually resume payments. On information and belief, because Nick Robinson is in charge of and oversees the accounting operations at NAC, he was involved in the decision to make these representations to Mr. Herman and can be considered as a maker of the representations. Based on information discovered in August 2017 (and which could have not been discovered previously even through the exercise of reasonable diligence) and based on further information and belief, these representations were false as, at the same time NAC stopped paying Mr. Herman and during its continued non-payment up to the present, it has paid Rob Herman and Nick Robinson exorbitant compensation, in the form of salaries and distributions, that far exceed what is reasonable

---

[4] NAC, via Rob Herman, sent certain NAC financial records to Manny Ortiz in early August 2017, prior to any Non-Disclosure Agreement with Mr. Ortiz being in place.

executive compensation for a business in NAC's field and having NAC's profitability. The unreasonable and excessive nature of this compensation will be further developed in discovery and will be the subject of expert testimony.  Additionally, upon information and belief the assurances about future payment were false as NAC never intended to resume payments as evidence, among other things, by the failure to place the retirement payments as a liability on NAC's books and records, which as not and could not have been discovered through reasonable diligence until, at the earliest, August 2017.

16.     Rob Herman and Nick Robinson, as the President and CEO of NAC, control the decision-making on what to pay themselves in compensation. In an intentional and tortious abuse of this decision-making power, they elected to pay themselves excessive compensation instead of making payments (or even partial payments) to Mr. Herman under the Retirement Agreement. This was and is misfeasance not nonfeasance. During the period of non-payment, Mr. Herman had no access to and had no entitlement to review the books and records of NAC. He, therefore, had no ability to discover the falsity of Rob Herman's representations to him that NAC lacked funds to pay him or to discovery the excessive compensation that Rob Herman and Nick Robinson were causing NAC to pay themselves, which was not discovered until August 2017.

17.     On information and belief, despite paying the excessive compensation to Rob Herman and Nick Robinson, between September 2014 and the present, NAC has been able to keep current on obligations for trade payables and bank debt. With the ability to pay trade payable and bank debt while still making these excessive payments to Rob Herman and Nick Robinson, NAC could have made payments or partial payments to Mr. Herman during this time period without jeopardizing its ability to pay its liabilities concerning trade payables and bank debt. Based on decisions made by Rob Herman and Nick Robinson, NAC elected not to do so and instead paid

the excessive compensation to Rob Herman and Nick Robinsons based on their direction. Information confirming this is in the exclusive possession of NAC since it is in NAC's internal accounting records and will be further developed in discovery and will be the subject of expert testimony. Mr. Herman did not have (and could not have discovered through reasonable diligence) any information in this regard until August 2017 and the Counterclaim Defendants' false representations discussed herein caused Mr. Herman to relax what would have been his normal vigilance in trying to determine if ulterior reasons, such as the excessive compensation being paid to Rob Herman and Nick Robinson, were the cause of NAC's purported inability to pay him.

18.     Additionally, NAC's failure to pay was not excused by any provision of the Retirement Agreement when its failure to pay began. Prior to any repudiation of the Retirement Agreement by NAC, including repudiation through its conduct and failure to pay, NAC's failure to pay was not excused by any provision of the Retirement Agreement concerning trade payables, bank debt or insolvency or competition. Information confirming this with regard to trade payables, bank debt and/or insolvency is in the exclusive possession of NAC as it is in NAC's internal accounting records and will be further developed in discovery and will be the subject of expert testimony. Mr. Herman did not have (and could not have discovered through reasonable diligence) any information in this regard until August 2017 and the Counterclaim Defendant's false representations discussed herein caused Mr. Herman to relax what would have been his normal vigilance in trying to determine if ulterior reasons, such as the excessive compensation being paid to Rob Herman and Nick Robinson, were the cause of NAC's purported inability to pay him.

19.     Similarly, NAC's failure to pay was not excused based on any non-compete provisions because NAC repudiated the Retirement Agreement long before any purported improper competition or solicitation by Mr. Herman. NAC alleges that Mr. Herman is improperly

competing via IFM (*see* Am. Compl. ¶¶ 25-35) but IFM was not even incorporated until December 2016 (over 2 years after NAC stopped paying Mr. Herman) and IMF engaged in no business that could arguably be considered competitive with NAC until, at the earliest, March 2018. Likewise, the alleged improper solicitations referenced in the Amended Complaint both occurred in 2017, several years after NAC stopped paying Mr. Herman under the Retirement Agreement.

20.     Upon information and belief, and in the alternative, if NAC was unable to make complete payments under the Retirement Agreement, NAC, Rob Herman and Nick Robinson were aware that NAC would be unable to fulfill its financial obligations under the Agreement at the time the Retirement Agreement was entered. Based on information and belief, NAC did not place the Retirement Agreement payments owed to Mr. Herman on its balance sheet as a liability, evidencing its intent not to make the payments and which fact was not discovered (and could not have discovered through reasonable diligence) until at the earliest August 2017. Thus, upon information and belief, NAC had no intention of making the full Retirement Agreement payments at the time the Retirement Agreement was entered.

21.     Because the ability to make these payments was central to Mr. Herman's decision to enter into the Retirement Agreement and if the inability to make these payments had been revealed the transaction would not have been consummated, NAC, Rob Herman and Nick Robinson had a duty and obligation to disclose any inability to make complete payments. Because of the familial and other relationships between Counterclaim-Defendants and Mr. Herman, it was reasonable of Mr. Herman to expect disclosure of NAC's inability to pay under the to be executed Retirement Agreement if NAC lacked such ability. Information confirming NAC's inability to pay under the to be executed Retirement Agreement is in the exclusive possession of NAC as it is in NAC's internal accounting records and will be further developed in discovery and will be the

subject of expert testimony. Mr. Herman did not have any information in this regard until August 2017 and the Counterclaim-Defendants' false representations discussed herein caused Mr. Herman to relax what would have been his normal vigilance in trying to determine if ulterior reasons, such as the excessive compensation being paid to Rob Herman and Nick Robinson, were the cause of NAC's purported inability to pay him.

22.     In May of 2015, NAC entered into new loan agreements with Alostar Bank. Upon information and belief, the relationship with Alostar Bank was necessary because NAC's prior lending institution had severed its relationship with NAC because NAC, via Mr. Robinson, had made false representations to it and/or supplied false financial documents or statements to it.[5] As a condition of making the loans, Alostar required that payments under the Retirement Agreement (which already were not being made by NAC) take a subordinated position to Alostar's debt and a Subordination Agreement was signed. That said, payments under the Retirement Agreement still could be made if NAC met certain financial covenants.

23.     Mr. Herman was contacted by NAC, via Rob Herman, requesting that he agree to the Subordination Agreement that Alostar was requiring and Rob Herman represented that NAC was struggling financially. Because it would help NAC, Mr. Herman agreed to the Subordination Agreement. Mr. Herman also offered to help NAC in any way possible including returning to work and trying to make sales and business visits for NAC. This offer was refused. Upon information and belief, this offer was refused because allowing Mr. Herman to assist NAC would likely have resulted in the excessive compensation that Rob Herman and Nick Robinson were directing NAC

---

[5]  Upon information and belief, Nick Robinson was previously a participant in a scheme to defraud and steal money from NAC via falsified financial and other records concerning NAC-controlled operations in Mexico from which he and/or his family profited to the detriment of NAC's financial well-being and, therefore, correspondingly to the detriment of Mr. Herman as a creditor of NAC. Rob Herman has advised Mr. Herman that documentation proving this fraudulent conduct by Nick Robinson has been provided to an attorney in Mexico for safekeeping.  It will be sought in discovery in this action.

to pay themselves being revealed to Mr. Herman.

24.     During the discussions about Alostar and the Subordination Agreement, neither NAC nor Rob Herman advised Mr. Herman that NAC was paying excessive compensation to Rob Herman or Nick Robinson. This excessive compensation belies the representations made to Mr. Herman that NAC was struggling financially. If NAC and/or Rob Herman had advised Mr. Herman of the excessive compensation payments, he would not have agreed to enter into the Subordination Agreement. Information confirming NAC's financial situation at the time the Subordination Agreement was entered is in the exclusive possession of NAC as it is in NAC's internal accounting records and Mr. Herman did not have access to and had no entitlement to review the books and records of NAC when the Subordination Agreement was signed. He therefore had no ability to discover the falsity of Rob Herman's representations to him that NAC was struggling financially or to discovery the excessive compensation that Rob Herman and Nick Robinson were causing NAC to pay themselves, evidence of which was not discovered (and could not have discovered through reasonable diligence) until August 2017. Further, the Counterclaim-Defendants' false representations discussed herein caused Mr. Herman to relax what would have been his normal vigilance in trying to determine if ulterior reasons, such as the excessive compensation being paid to Rob Herman and Nick Robinson, were the cause of NAC's purported inability to pay him. The unreasonable and excessive nature of this compensation will be further developed in discovery and will be the subject of expert testimony.

25.     Upon information and belief, the financial covenants in the Subordination Agreement were met; yet, NAC, in violation of the Retirement Agreement, simply chose not to make the required payments to Mr. Herman. Rob Herman and Nick Robinson were the decision-makers on whether to pay Mr. Herman. At the time payments to Mr. Herman were not being made,

NAC, at the direction of Rob Herman and Nick Robinson continued to pay Rob Herman and Nick Robinson excessive compensation. The unreasonable and excessive nature of this compensation will be further developed in discovery and will be the subject of expert testimony. Information confirming whether the financial covenants in the Subordination Agreement were met is in the exclusive possession of NAC since it would be found in NAC's internal accounting records. Mr. Herman did not have access to and had no entitlement to review the books and records of NAC while the Subordination Agreement was in effect. He therefore had no ability to discover the fraudulent conduct of NAC, Rob Herman and Nick Robinson in tortiously paying themselves excessive salaries while not paying Mr. Herman under the Retirement Agreement, possible evidence of which was not discovered (and could not have discovered through reasonable diligence) until August 2017. Further, the Counterclaim-Defendants' false representations discussed herein caused Mr. Herman to relax what would have been his normal vigilance in trying to determine if ulterior reasons, such as the excessive compensation being paid to Rob Herman and Nick Robinson, were the cause of NAC's purported inability to pay him.

26.     The Subordination Agreement makes clear that its existence and operation does not absolve NAC of its ultimate obligations to pay Mr. Herman under the Retirement Agreement.  In fact, Mr. Herman requested specific language be inserted into the Subordination Agreement to clarify this point, a fact that NAC is well aware of because counsel for NAC conveyed Mr. Herman's suggested changes to counsel for Alostar.

27.     The Subordination Agreement was canceled in mid-August 2017. At that time, IFM (discussed in the Amended Complaint in ¶¶ 25-35) was not engaged in any business that is competitive with NAC. After cancelation of the Subordination Agreement, NAC has not made any payments to Mr. Herman under the Retirement Agreement.

28.     With regard to the excessive payments that NAC, at the direction of Rob Herman and Nick Robinson, made to Rob Herman and Nick Robinson, upon information and belief, in the time period 2014-2017, when NAC has been in default and paid **$0** to Mr. Herman, via NAC, Rob Herman and Nick Robinson have paid themselves and directed payment to themselves, at least, **$6,400,000** in compensation – a huge excess over what a typical executive in the industry at a similar company would make. Although these estimates will be refined based on discovery and expert analysis, upon information and belief, Rob Herman and Nick Robinson have caused NAC to pay themselves excess compensation of roughly **$3,600,000** from 2014-17 when compared to industry norms, during which time period NAC paid Mr. Herman **$0** under the Retirement Agreement.

29.     Simply, rather than honor the Retirement Agreement, Rob Herman and Nick Robinson, in bad faith and fraudulently, elected to pay themselves large sums of money from NAC. This is not simply a failure of NAC to make contractual payments under the Retirement Agreement. Rather, it is a concerted and intentional effort by Rob Herman and Nick Robinson to fraudulently enrich themselves at the expense of Mr. Herman. While knowing that NAC had financial obligations to Mr. Herman that were going unpaid, Rob Herman and Nick Robinson sucked total compensation payments of $6.4 million out of NAC from 2014-2017, all while Counterclaim-Defendants falsely positing to Mr. Herman that NAC lacked resources to pay him.[6] This was and is misfeasance not nonfeasance.

30.     In Paragraph 54 of the Amended Complaint, NAC pleads that making the retirement payments to Mr. Herman would render it insolvent.

---

[6] Upon information and belief, NAC also pays Rob Herman's wife, Terra Herman, a salary of approximately $100,000 per year, which, upon information and belief, makes her one of NAC's most highly compensated employees.

## COUNT I: BREACH OF CONTRACT
(against NAC)

31.     Mr. Herman incorporates by reference each and every allegation contained in Paragraphs 1 through 30 as though fully set forth herein.

32.     From and following the payment of the sums detailed in Paragraph 14 above, payments of the Retirement Benefits due under the Retirement Agreement ceased and NAC has made no further payment to Mr. Herman, although demand has been made therefore, and there is currently due, owing and unpaid, the remaining balance of the Retirement Benefits totaling thirteen million, eight hundred eighty-seven thousand dollars ($13,887,000) based on NAC's repudiation of the Agreement.  The current past due amount, without interest, is over $5,700,000 and growing each month.

33.     Plaintiff has done all things on his part to be done in accordance with the Retirement Agreement, including tendering his resignation from the board of directors of NAC, excepting those matters that Mr. Herman was and has been excused from or prevented from undertaking and performing due to Counterclaim-Defendants' wrongful conduct. This would include being excused from any non-compete provisions because NAC repudiated the Retirement Agreement long before any purported improper competition or solicitation by Mr. Herman, as NAC alleges that Mr. Herman is improperly competing via IFM (*see* Am. Compl. ¶¶ 25-35) but IFM was not even incorporated until December 2016 and engaged in no business that could arguably be considered competitive with NAC until, at the earliest, March 2018. Mr. Herman does not own IMF, nor manage, operate or control its daily operations. And, while Mr. Herman visited Fry Communications in July 2016 to see a piece of equipment, it was NAC President Rob Herman who introduced him to the owner of the equipment/technology for purposes of potentially buying it, and, Mr. Herman presented the potential to purchase the machine to NAC and even offered to

buy it for NAC. NAC declined Mr. Herman's offers. Likewise, the alleged improper solicitations referenced in the Amended Complaint both occurred in 2017, years after NAC stopped paying Mr. Herman under the Retirement Agreement.

34.     NAC's failure and refusal to pay the sums remaining owed pursuant to the Retirement Agreement, was wrongful, without excuse, or justification and constitutes a breach and a repudiation thereof.

35.     The Retirement Agreement included an implied covenant of good faith and fair dealing, which operated to prohibit NAC from undertaking any act or refusing to perform an act which would deny Mr. Herman the fruits and benefits reasonably anticipated from the Retirement Agreement.

36.     NAC, through its agents, has violated the covenant of good faith and fair dealing by, *inter alia*, paying, at least, $3.6 million in excess compensation to Rob Herman and Nick Robinson instead of funding the retirement payments.

37.     As a direct and proximate result of NAC's breach and repudiation of the Retirement Agreement, Mr. Herman has sustained damage and injury all to his loss in the sum of $13,887,000.

### COUNT II: QUANTUM MERUIT/UNJUST ENRICHMENT
(against NAC) (pled in the alternative)

38.     Mr. Herman incorporates by reference each and every allegation contained in Paragraphs 1 through 37 as though fully set forth herein.

39.     The payments to Mr. Herman under the Retirement Agreement were to compensate him for having formed, operated, developed, and built NAC into an influential, dynamic, profitable and well-run organization with offices and facilities located throughout the United States and Mexico. Mr. Herman invested his time, effort, labor, skills, influence, trust and opportunities ("Investments") to and for the benefit of NAC, and without such Investments, NAC would not be

the successful and profitable entity that it was at the time of the Retirement Agreement through the present. Thus, the Parties concurred that the Investments had a value of $15,000,000.

40.     NAC offered these payments with the intention and reasonable expectation of inducing Mr. Herman to take certain actions, such as resigning from NAC's Board and making arrangements to have family members transfer NAC stock to Rob Herman as discussed above, which then gave Rob Herman the ability to control decisions, along with Nick Robinson, about whether or not to make payments to Mr. Herman.

41.     In reasonable reliance on the understanding that he would be compensated for the Investments, Mr. Herman entered into the Retirement Agreement and took the related actions to his financial detriment.

42.     Based on fraud in the inducement as well as potentially applicable contractual and equitable doctrines such as repudiation, mistake and estoppel, the Retirement Agreement may be void or voidable and a contract between the Parties would not exist. To the extent the Retirement Agreement is void or voidable, NAC will have knowingly received, accepted and appreciated the benefits of the Investments but Mr. Herman will not have been compensated for them.

43.     Retention of the Investments by NAC without proper compensation to Mr. Herman would be inequitable and unjust.

44.     Mr. Herman is therefore entitled to compensation for his Investments in NAC in the sum of $13,887,000, which equates to the value of the Investments through which NAC has been unjustly enriched.

## COUNT III: PROMISSORY ESTOPPEL
### (against NAC) (pled in the alternative)

45.     Mr. Herman incorporates by reference each and every allegation contained in paragraphs 1 through 44 as though fully set forth herein.

46.     NAC offered the retirement payments to Mr. Herman with the intention and reasonable expectation of inducing Mr. Herman to take certain actions, such as resigning from NAC's Board and making arrangements to have family members transfer NAC stock to Rob Herman as discussed above.

47.     In reasonable reliance on the understanding that he would be compensated for the Investments, Mr. Herman entered into the Agreement and took the related actions to his financial detriment.

48.     Based on fraud in the inducement as well as potentially applicable contractual and equitable doctrines such as repudiation, mistake and estoppel, the Retirement Agreement may be void or voidable and a contract between the Parties would not exist. To the extent the Agreement is void or voidable, NAC failed to adhere to its promises and to compensate Mr. Herman for the Investments and related action he took. Thus, injustice can be avoided only by having NAC compensate Mr. Herman for the Investments.

49.     Mr. Herman is therefore entitled to compensation for his Investments in NAC in the sum of, at least, $13,887,000.

## COUNT IV: FRAUD IN THE INDUCEMENT
### (against all Counterclaim-Defendants)

50.     Mr. Herman incorporates by reference each and every allegation contained in paragraphs 1 through 49 as though fully set forth herein.

51.     To induce Mr. Herman to enter the Agreement, in June 2013 at the time the Retirement Agreement was negotiated and executed, the Counterclaim-Defendants, as the entity making the Agreement and its President and its CEO, represented directly and/or implicitly and/or by omission that NAC had the financial ability to make the payments under the Agreement that were owed to Mr. Herman.

52.     Upon information and belief, those representations and omissions were knowingly false and misleading without belief that they were true and/or made with indifference to their truth in that NAC did not have the ability to make the payments and the Counterclaim-Defendants were aware of or recklessly disregarded this inability.  Thus, upon information and belief, NAC had no intention of making the full Retirement Agreement payments at the time the Retirement Agreement was entered.

53.     Information confirming NAC's inability to pay under the to be executed Retirement Agreement is in the exclusive possession of NAC as it is in NAC's internal accounting records and will be further developed in discovery and will be the subject of expert testimony.  Mr. Herman did not have any information in this regard until August 2017 and, after NAC stopped paying, the Counterclaim-Defendants' false representations discussed herein caused Mr. Herman to relax what would have been his normal vigilance in trying to determine if NAC had the ability to pay at the time the Retirement Agreement was entered.

54.     Through their false representations and omissions, the Counterclaim-Defendants induced Mr. Herman to enter the Agreement under the false belief that he would receive fair compensation for the Investments and to induce him to take related actions, such as resigning from NAC's Board and making arrangements to have family members transfer NAC stock to Rob Herman as discussed above, to his financial detriment.

55.     The representations and omissions by Counterclaim-Defendants were material because the ability to make the retirement payments was central to Mr. Herman's decision to enter into the Retirement Agreement and, if the inability to make these payments had been revealed, the transaction would not have been consummated. The representations and omissions were reasonably relied upon by Mr. Herman in that, among other things, he took the actions set forth in the prior paragraph and, until August 2017, had no reason to believe he had been lied to by Counterclaim-Defendants.

56.     The duty not to make false representations and omissions arises independent of and pre-dates any contractual duties owed by NAC to Mr. Herman. This count is not about NAC's failure to pay under the Retirement Agreement. Rather, it is about the Counterclaim-Defendants duping Mr. Herman into signing the agreement and into taking the actions indicated in paragraph 54 with knowledge that NAC did not have the ability to satisfy its payment obligations under the Retirement Agreement and misrepresentation of and/or failure to disclose this material fact despite a duty to do so since (i) the ability to make these payments was central to Mr. Herman's decision to enter into the Retirement Agreement and/or (ii) if the inability to make these payments had been revealed the transaction would not have been consummated.

57.     On information and belief, the misrepresentations and omissions by Counterclaim-Defendants alleged herein were so outrageous as to demonstrate willful, wanton and reckless conduct against Mr. Herman, with an intent to vex and injure Mr. Herman.

58.     Mr. Herman has suffered substantial injury, including but not limited to the value of the Investments as a result of his reasonable reliance on Counterclaim-Defendants representations.

59.     Mr. Herman is therefore entitled to compensation for his Investments in NAC in the sum of, at least, $13,887,000.

## COUNT V: NEGLIGENT MISREPRESENTATION
(against all Counterclaim-Defendants)

60.     Mr. Herman incorporates by reference each and every allegation contained in paragraphs 1 through 59 as though fully set forth herein.

61.     To induce Mr. Herman to enter the Agreement, in June 2013 at the time the Retirement Agreement was negotiated and executed, the Counterclaim-Defendants, as the entity making the Agreement and its President and its CEO, represented directly and/or implicitly and/or by omission that NAC had the financial ability to make the payments under the Agreement that were owed to Mr. Herman. This was a transaction that NAC had a pecuniary interest in and its representations and omissions were for Mr. Herman's guidance in deciding to enter the Retirement Agreement.

62.     Upon information and belief, those representations and omissions were false and made negligently, grossly negligently, recklessly, and/or made with indifference to whether they were true and correct in that NAC did not have the ability to make the payments and the Counterclaim-Defendants were aware of or recklessly disregarded this inability. Thus, upon information and belief, NAC had no intention of making the full Retirement Agreement payments at the time the Retirement Agreement was entered.

63.     Information confirming NAC's inability to pay under the to be executed Retirement Agreement is in the exclusive possession of NAC as it is in NAC's internal accounting records and will be further developed in discovery and will be the subject of expert testimony.  Mr. Herman did not have any information in this regard until August 2017 and, after NAC stopped paying, the

Counterclaim-Defendants' false representations discussed herein caused Mr. Herman to relax what would have been his normal vigilance in trying to determine if NAC had the ability to pay at the time the Retirement Agreement was entered.

64.     Through their false representations and omissions, the Counterclaim-Defendants induced Mr. Herman to enter the Agreement under the false belief that he would receive fair compensation for the Investments and to induce him to take related actions, such as resigning from NAC's Board and making arrangements to have family members transfer NAC stock to Rob Herman as discussed above, to his financial detriment.

65.     The representations and omissions by Counterclaim-Defendants were material because the ability to make these payments was central to Mr. Herman's decision to enter into the Retirement Agreement and, if the inability to make these payments had been revealed, the transaction would not have been consummated. The representations and omissions were reasonably relied upon by Mr. Herman in that, among other things, he took the actions set forth in the prior paragraph and, until August 2017, had no reason to believe he had been lied to by Counterclaim Defendants.

66.     The duty not to make false representations and omissions arises independent of and pre-dates any contractual duties owed by NAC to Mr. Herman. This count is not about NAC's failure to pay under the Retirement Agreement. Rather, it is about the Counterclaim-Defendants negligently and/or recklessly duping Mr. Herman into signing the agreement and into taking the actions indicated in paragraph 64 even though NAC did not have the ability to satisfy its payment obligations under the Retirement Agreement and misrepresentation of and/or failure to disclose this material fact despite a duty to do so since the ability to make these payments was (i) central to

Mr. Herman's decision to enter into the Retirement Agreement and/or (ii) if the inability to make these payments had been revealed the transaction would not have been consummated

67.     On information and belief, the misrepresentations and omissions by Counterclaim-Defendants alleged herein were so outrageous as to demonstrate willful, wanton and reckless conduct against Mr. Herman, with an intent to vex and injure Mr. Herman.

68.     Mr. Herman has suffered substantial injury, including but not limited to the value of the Investments as a result of his reasonable reliance on Counterclaim-Defendants representations.

69.     Mr. Herman is therefore entitled to compensation for his Investments in NAC in the sum of, at least, $13,887,000.

### COUNT VI- FRAUD
(against NAC)

70.     Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 69 as though fully set forth herein.

71.     Counterclaim-Defendant NAC was aware of NAC's financial condition at the time that it paid approximately $6,400,000 in compensation to Rob Herman and Nick Robinson collectively between 2014-17, which compensation was excessive by, at a minimum, $3,600,000 and was further aware that by distribution of those excessive sums to Rob Herman and Nick Robinson, NAC would be rendered incapable of satisfying its obligations to Mr. Herman.

72.     By paying Rob Herman and Nick Robinson these excessive sums, NAC defrauded Mr. Herman in that it falsely represented directly, indirectly or by omission, including the representations made by Rob Herman to Mike Herman discussed herein, that NAC did not have the ability to pay Mr. Herman, when, in fact it did. Those representation were knowingly false and misleading without belief that they were true and/or made with indifference to their truth in that

NAC did have the ability to make the payments to Mr. Herman but, instead, at Rob Herman and Nick Robinson's direction, paid $6,400,000 to Rob Herman and Nick Robinson while paying Mr. Herman $0. Additionally, NAC, via Rob Herman provided knowingly false assurances that it would make the retirement payments at some point.

73. The representations by Counterclaim-Defendants were material as the reason for the inability to make payments was crucial to the Parties' rights and obligations. The representations were reasonably relied upon by Mr. Herman because, until August 2017, he had no reason to doubt the representations nor to know the excessive compensation payments that NAC was making to Rob Herman and Nick Robinson were the true reason that NAC did not have sufficient funds to pay him under the Retirement Agreement.

74. The duty not to commit fraud, such as that engaged in by Counterclaim-Defendants arises from a broader, independent social duty, compared to the contractual duties owed to Mr. Herman under the Agreement. This is not simply a failure of NAC to make contractual payments under the Retirement Agreement. Rather, it is a concerted and intentional effort by NAC, via the actions of Rob Herman and Nick Robinson, to fraudulently enrich Rob Herman and Nick Robinson while knowing that NAC had financial obligations to Mr. Herman that were going unpaid while Rob Herman and Nick Robinson sucked total compensation payments of $6.4 million out of NAC from 2014-2017, all while falsely positing to Mr. Herman that NAC lacked resources to pay him.

75. The conduct of NAC alleged herein was so outrageous as to demonstrate willful, wanton and reckless conduct against Mr. Herman, with an intent to vex and injure Mr. Herman.

76. Because of its tortious conduct, NAC is liable to Mr. Herman for at least, $3,600,000.

## COUNT VII- FRAUD
(against Rob Herman and Nick Robinson)

77.     Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 76 as though fully set forth herein.

78.     Counterclaim-Defendants Nick Robinson and Rob Herman were aware of NAC's financial condition at the time that they directed NAC to the pay themselves approximately $6,400,000 in compensation collectively between 2014-17, which compensation was excessive by, at a minimum, $3,600,000 and was further aware that by distribution of those excessive sums to Rob Herman and Nick Robinson, NAC would be rendered incapable of satisfying its obligations to Mr. Herman.

79.     By directing NAC to pay themselves these excessive sums, Rob Herman and Nick Robinson defrauded Mr. Herman in that they falsely represented directly, indirectly or by omission, including the representations made by Rob Herman to Mike Herman discussed herein, that NAC did not have the ability to pay Mr. Herman, when, in fact it did. Those representations were knowingly false and misleading without belief that they were true and/or made with indifference to their truth in that NAC did have the ability to make the payments to Mr. Herman but, instead, at Rob Herman and Nick Robinson's direction, paid $6,400,000 to Rob Herman and Nick Robinson while paying Mr. Herman $0. Additionally, Rob Herman provided knowingly false assurances that NAC would make the retirement payments at some point.

80.     The representations by Rob Herman and Nick Robinson were material as the reason for the inability to make payments was crucial to the Parties' rights and obligations. The representations were reasonably relied upon by Mr. Herman because, until August 2017, he had no reason to doubt the representations nor to know the excessive compensation payments that NAC

was making to Rob Herman and Nick Robinson were the true reason that NAC did not have sufficient funds to pay him under the Retirement Agreement.

81.     The duty not to commit fraud, such as that engaged in by Counterclaim-Defendants arises from a broader, independent social duty, compared to the contractual duties owed to Mr. Herman under the Agreement. And, in any event, Mr. Herman is not in contractual privity with either Rob Herman or Nick Robinson. This is not simply a failure of NAC to make contractual payments under the Retirement Agreement. Rather, it is a concerted and intentional effort by Rob Herman and Nick Robinson to fraudulently enrich themselves while knowing that NAC had financial obligations to Mr. Herman that were going unpaid. Rob Herman and Nick Robinson sucked total compensation payments of $6.4 million out of NAC from 2014-2017, all while falsely positing to Mr. Herman that NAC lacked resources to pay him. This was and is misfeasance not nonfeasance.

82.     The conduct of Rob Herman and Nick Robinson alleged herein was so outrageous as to demonstrate willful, wanton and reckless conduct against Mr. Herman, with an intent to vex and injure Mr. Herman.

83.     Because of their tortious conduct, Counterclaim-Defendants Nick Robinson and Rob Herman are liable to Mr. Herman for at least, $3,600,000. Additionally, Counterclaim-Defendants Nick Robinson and Rob Herman hold the sums paid to and possessed by them as creditors of NAC for the benefit of Mr. Herman and should be required to pay over the sum of, at least, $3,600,000.

## COUNT VIII – FRAUDULENT AND VOIDABLE TRANSFER, 12 Pa.C.S.A.§ 5104
### (against all Counterclaim-Defendants)

84.     Mr. Herman incorporates by reference each and every allegation contained in Paragraphs 1 through 83 as though fully set forth herein.

85.     This is an equitable claim based on the equitable rights and remedies codified in Pennsylvania's version of the Uniform Fraudulent Transfer Act.

86.     Upon information and belief, at all times herein mentioned, excepting for the facts set forth in this cause of action, NAC was solvent in that its assets exceeded NAC's debts and NAC was generally able to meet its debts as they became due.

87.     Between 2014-2017, Nick Robinson and Rob Herman, and each of them, transferred, concealed and/or removed from NAC, sums exceeding $6,400,000 and converted those sums to their own and personal use and benefit, to the exclusion of Mr. Herman.

88.      Counterclaim-Defendants intended to conceal and cloak those sums as assets of NAC which otherwise would have been available to partially satisfy, service and pay the benefits under the Agreement; this intent is evidenced, *inter alia*, by the fact that NAC, through Rob Herman and Nick Robinson, repeatedly informed Mr. Herman that NAC lacked sufficient funds to make payments to him at the same time Rob Herman and Nick Robinson were directing NAC to pay them the above sums, which exceed reasonable and appropriate compensation for a company of NAC's size and profitability by, at least, $3,600,000.

89.     The Counterclaim-Defendants engaged in these transfers with the intent to hinder, delay and/or defraud Mr. Herman, as they evidence an effort to pay Nick Robinson and Rob Herman undeserved, large sums to the detriment of the monies owed to Mr. Herman, which intent is evidenced by the misrepresentations and other facts pled herein and, in any event, need only be pled generally under the second sentence of Federal Rule of Civil Procedure 9(b).

24

90.     Such transfers were in violation of the Pennsylvania's *Uniform Fraudulent Transfer Act*, 12 Pa.C.S.A. § 5101 et seq, as well as California's counterpart, *e.g.*, Cal.Civ.Code §3439 et seq.

91.     Mr. Herman is a "creditor" under applicable law.

92.     The transfer of the significant sums from NAC to Nick Robinson and Rob Herman was intended to hinder, delay, and defraud creditors including Mr. Herman, as discussed above.

93.      The transfer of the significant sums from NAC to Nick Robinson and Rob Herman was made without NAC receiving a reasonably equivalent value in exchange for the transfer in that neither Rob Herman nor Nick Robinson had supplied services to NAC sufficient to justify the payment of these large sums, which exceed reasonable compensation for an executive of a company with the size and profitability of NAC in NAC's line of business by, at least, $3,600,000.

94.     The transfer of the significant sums from NAC to Nick Robinson and Rob Herman caused the remaining assets of NAC, after such transfer(s), to be unreasonably small in relation to the business and/or transactions, it was engaged in or committed to, specifically after making these excessive payments to Rob Herman and Nick Robinson, NAC had insufficient assets with which to make the retirement payments owed to Mr. Herman. NAC's financial status after the transfers will be the subject of discovery and expert testimony.

95.     The transfer of the significant sums from NAC to Nick Robinson and Rob Herman were made to "insiders" in that Rob Herman and Nick Robinson are the President and CEO of NAC and control the decision-making on how much compensation to pay themselves; constituted removal and concealment of NAC's assets as the excess compensation was not disclosed to Mr. Herman; rendered NAC insolvent as a result of and shortly after the transfers were made to Nick Robinson and Rob Herman, specifically, it did not have the ability to make the payments owed to

Mr. Herman and NAC has pled this in Paragraph 54 of its Amended Complaint; and the transfers occurred shortly after a substantial debt was incurred, in that they occurred after the obligations to pay Mr. Herman under the Retirement Agreement became effective. NAC's financial status after the transfers will be the subject of discovery and expert testimony.

96.     Counterclaim-Defendants, and each of their participation in the fraudulent transfers described in this cause of action was wrongful, unlawful and was intended to damage, injure and violate the rights of Mr. Herman.

97.     By virtue of the fraudulent transfers alleged in this cause of action, Counterclaim-Defendants and each of them, are legally required to disgorge the total value of the excess compensation paid to Nick Robinson and Rob Herman in the total sum of at least $3,600,000.

**COUNT IX – FRAUDULENT AND VOIDABLE TRANSFER, 12 Pa.C.S.A.§ 5105**
(against all Counterclaim-Defendants)

98.     Mr. Herman incorporates by reference each and every allegation contained in Paragraphs 1 through 97 as though fully set forth herein.

99.     This is an equitable claim based on the equitable rights and remedies codified in Pennsylvania's version of the Uniform Fraudulent Transfer Act.

100.     Upon information and belief, at all times herein mentioned, excepting for the facts set forth in this cause of action, NAC was solvent in that its assets exceeded NAC's debts and NAC was generally able to meet its debts as they became due.

101.     Between 2014-2017, Nick Robinson and Rob Herman, and each of them, transferred, concealed and/or removed from NAC, sums exceeding $6,400,000 and converted those sums to their own and personal use and benefit, to the exclusion of Mr. Herman;

102.   Such transfers were in violation of the Pennsylvania's *Uniform Fraudulent Transfer Act*, 12 Pa.C.S.A. § 5101 et seq, as well as California's counterpart, *e.g.*, Cal.Civ.Code §3439 et seq.

103.   Mr. Herman is a "creditor" under applicable law.

104.   The transfer of the significant sums from NAC to Nick Robinson and Rob Herman was made without NAC receiving a reasonably equivalent value in exchange for the transfer in that neither Rob Herman nor Nick Robinson had supplied services to NAC sufficient to justify the payment of these large sums, which exceed reasonable compensation for an executive of a company with the size and profitability of NAC in NAC's line of business by, at least, $3,600,000.

105.   After making these excessive payments to Rob Herman and Nick Robinson, NAC was insolvent in that it had insufficient assets with which to make the retirement payments owed to Mr. Herman. NAC has pled this in Paragraph 54 of its Amended Complaint. NAC's financial status after the transfers will be the subject of discovery and expert testimony.

106.   Counterclaim-Defendants, and each of their participation in the fraudulent transfers described in this cause of action was wrongful, unlawful and was intended to damage, injure and violate the rights of Mr. Herman.

107.   By virtue of the fraudulent transfers alleged in this cause of action, Counterclaim-Defendants and each of them, are legally required to disgorge the total value of the excess compensation paid to Nick Robinson and Rob Herman in the total sum of at least $3,600,000.

## COUNT X: CONSPIRACY
(against Nick Robinson and Rob Herman)

108.    Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 107 as though fully set forth herein.

109.    Nick Robinson and Rob Herman, as individuals and outside the scope of their duties at NAC, have knowingly, intentionally, maliciously and willfully acted in concert and entered into an agreement with the common purpose and intent and with the goal of injuring Michael Herman by, *inter alia*, conspiring to pay themselves large amounts of money out of NAC while fraudulently and/or negligently representing directly, implicitly or by omission that NAC had insufficient funds to pay its debts owed to Mr. Herman.  No justification exists for the intent and conduct of Rob Herman and Nick Robinson and the injury to Mr. Herman is not simply an accidental side effect of proper conduct.

110.    By engaging in the above acts incorporated by reference or specifically set forth in these Counterclaims, Nick Robinson and Rob Herman engaged in overt acts done in furtherance of the conspiracy and also acted with malice and without justification.

111.    As a direct and proximate result of the unlawful acts and conspiratorial conduct of Nick Robinson and Rob Herman, Mr. Herman has suffered damages.

112.    The above actions have been so outrageous as to demonstrate willful, wanton and reckless conduct directed at Mr. Herman with an intent to vex and injure him.

113.    By virtue of Nick Robinson's and Rob Herman's conspiratorial conduct, Mr. Herman is entitled to compensatory damages in an amount to be determined at trial, but in any event, not less that the excessive sums Nick Robinson and Rob Herman have paid to themselves from NAC, which are believed to be in excess of $3,600,000.

## COUNT XI: UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICE PURSUANT TO SECTION 17200 ET SEQ. OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE
### (against all Counterclaim-Defendants)

114.　Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 113 as though fully set forth herein.

115.　Based upon facts alleged above, Mr. Herman made the Investments in NAC that the parties mutually valued at $15,000,000.

116.　As described above, the Counterclaim-Defendants engaged in unlawful, unfair and fraudulent business acts and practices in violation of California Business & Professions Code section 17200 *et seq.* as alleged in Counts I through X and continue to do so, including, *inter alia*, the following unlawful, unfair, and fraudulent business acts or practices as pled herein each of which is individually sufficient to support a violation of said section 17200 *et seq.*:

    a.　Fraudulent and/or negligent misrepresentation;

    b.　Fraud; and

    c.　Conspiring to deprive Mr. Herman of the value of the Investments.

117.　This conduct injured Mr. Herman, a California resident, in California.

118.　As a result of such conduct, Counterclaim-Defendants should be required to provide restitution to Mr. Herman based on the value of the Investments that they have improperly deprived him of and which they improperly have reaped the benefits of.

119.　Mr. Herman is therefore entitled to restitution from NAC in the sum of, at least, $13,887,000.

## COUNT XII: DECLARATORY JUDGMENT

120.　Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 120 as though fully set forth herein.

121.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., this Court may declare the rights and other legal relations of any interested party.

122.    There exists a real and actual controversy between Mr. Herman and NAC as to the Agreement.

123.    The interests of the parties will be best served if this Court will enter a declaratory judgment setting forth the rights of the parties with respect to this dispute including as follows:

a.    That the Retirement Agreement's restriction on competition is of no force or effect due, *inter alia*, to a failure of consideration and NAC's breach of and repudiation of the Agreement;

b.    That the Retirement Agreement's restriction on solicitation of NAC personnel is of no force or effect due, *inter alia*, to a failure of consideration and NAC's breach of and repudiation of the Agreement;

c.    That the Retirement Agreement's restriction on Mr. Herman's ability to assign the Agreement is unenforceable and of no force or effect due, *inter alia*, to a failure of consideration and NAC's breach of and repudiation of the Agreement.

d.    NAC's breach, repudiation, and non-performance of the Retirement Agreement justify acceleration and immediate payment of the unpaid balance of principal owed pursuant to the Retirement Agreement.

124.    The relief sought by Mr. Herman will substantially resolve the controversy relative to the respective interests of Mr. Herman and NAC.

125.    A declaratory judgment is particularly appropriate for issues of contractual interpretation as are herein presented.

## REQUEST FOR IMPOSITION OF CONSTRUCTIVE TRUST
### (against Nick Robinson, Rob Herman and NAC)

126.    Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 125 as though fully set forth herein.

127.    By virtue of Counterclaim-Defendants Nick Robinson and Rob Herman diverting assets of NAC to themselves personally, with no corresponding benefit deriving to Defendant NAC in that the $6,400,00 in compensation payments were not reasonable under industry standards, such transfers were wrongful and fraudulent and Counterclaim-Defendants Nick Robinson and Rob Herman have been unjustly enriched to the detriment of Mr. Herman.

128.    As a consequence of Defendants Nick Robinson's and Rob Herman's conduct as alleged, they, and each of them, are constructive trustees of the monies paid over and applied to their personal and non-NAC purposes, all for the benefit of Mr. Herman as the beneficiary of such constructive trust.

129.    Accordingly, based on the claims pled in Counts I though XI and the averments in paragraphs 1-128 above, and to ensure that funds are available in the event Mr. Herman is successful on the merits and to avoid Nick Robinson and Rob Herman from dissipating assets during the pendency of the litigation to the detriment of Mr. Herman, the Court should impose a constructive trust on Nick Robinson and Rob Herman in the amount of, at least, $3,600,000.

130.    Additionally, at issue in this dispute, is NAC's continued obligation to make payments under the Retirement Agreement and its unjust enrichment for failure to make past due payments and anticipated future payments to Mr. Herman under the Retirement Agreement. To ensure that funds are available in the event Mr. Herman is successful on the merits and to avoid the Counterclaim-Defendants from dissipating assets during the pendency of the litigation to the detriment of Mr. Herman, NAC should also be required to pay into the constructive trust the past

due amounts owed to Mr. Herman (which total approximately $5,700,000 without interest) and the monthly retirement payments owed to Mr. Herman going forward ($130,000 per month), all for the benefit of Mr. Herman as the beneficiary of such constructive trust.

131.    Accordingly, Mr. Herman respectfully requests preliminary and permanent injunctive relief in the form of a constructive trust to be imposed on the above fund.

### JURY DEMAND

Plaintiff demands a trial before a jury for all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Mr. Herman prays judgment against the Counterclaim-Defendants, and each of them, for the following:

1.    compensatory damages for the sum of no less than $13,887,000 in accordance with proof at trial, including $3,600,000 to be paid by Rob Herman and Nick Robinson in the form of, *inter alia*, disgorgement;

2.    preliminary and permanent injunctive relief in the form of the imposition of a constructive trust in the amount of, at least, $3,600,000 to be funded by Rob Herman and Nick Robinson and to be used to pay amounts owed to Mr. Herman under the Retirement Agreement;

3.    preliminary and permanent injunctive relief in the form of payment into the constructive trust of the past due amounts owed to Mr. Herman under the Retirement Agreement, which total is approximately $5,700,00, and, during the pendency of this litigation, payment into the constructive trust of the $130,000 that is owed to Mr. Herman each month;

4.    punitive or exemplary damages in accordance with proof at trial;

5.    a declaration of the rights and responsibilities of the Parties under the Retirement Agreement;

6.    attorney's fees and costs;

7.    prejudgment interest on all sums found due; and

8.    such other and further relief as the Court deems just and appropriate.


Dated:  April 2, 2018                    Respectfully submitted,


                                          s/ David J. Berardinelli
                                         David J. Berardinelli (PA ID #79204)
                                         DeForest Koscelnik Yokitis & Berardinelli
                                         3000 Koppers Building
                                         Pittsburgh, PA l5219
                                         *Counsel for Michael Herman*