# EXHIBIT 2

1

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                       * * *

4   NORTH AMERICAN COMMUNICATIONS,        )
    INC.,                                 )
5         Plaintiff,                      )
                                          )   NO. 3:17-CV-157
6         vs.                             )
                                          )
7   MICHAEL HERMAN,                       )
                                          )
8         Defendant and                   )
          Counterclaim-Plaintiff          )
9                                         )
          vs.                             )
10                                        )
    NORTH AMERICAN                        )
11  COMMUNICATIONS, INC.,                 )
    ROBERT HERMAN and                     )
12  NICHOLAS ROBINSON,                    )
                                          )
13        Counterclaim-Defendants.        )
                                          )

14

15                       * * *

16            DEPOSITION OF MICHAEL HERMAN

17                       * * *

18            FRIDAY, NOVEMBER 9, 2018

19                       * * *

20

21    REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
      WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY
22

23

24

25

59

1    would call house arrest.  It was house detention.  I

2    had an ankle bracelet on, there was a monitor there,

3    and in all the time I went and came, I never missed

4    a beat.

5        Q.    Were you able to fly your plane during

6    that period?

7        A.    I was able to fly my plane with

8    permission from my probation officer.

9        Q.    And at that time you were not receiving

10   retirement payments from North American, correct?

11       A.    Zip.  That's Z-I-P.

12       Q.    And sometime in 2016 you learned of PJ

13   Donahue and this machine that he engineered; is that

14   right?

15       A.    From my son.

16       Q.    Your son Rob?

17       A.    Took me there, I think it was his

18   birthday we went.

19       Q.    Am I correct that North American was not

20   interested in buying this machine?

21            MR. BERARDINELLI:  Object to the form.

22       A.    That is correct, in the end.

23       Q.    Tell me how -- how it all went.

24       A.    Rob told me about this piece of

25   equipment.  He -- I don't remember his exact words,

M. Herman - by Ms. DiVittore

60

1  but it reminded me of what I saw back in the '80s

2  when I explained who I met and where we ended up

3  with the patents.  And he made a date and we flew

4  into Trenton and met PJ at a restaurant and we had a

5  long discussion about it.  And when I talked to Rob

6  about it, he said that he didn't have the

7  wherewithal in terms of finances and Nick was not

8  interested in the project at all.  I offered to put

9  up the money for it, to put it in their plant.  I

10  thought it would -- they had the mechanical ability

11  and the brains to turn this thing around and maybe

12  do some good for the company because they do well, I

13  get money.  They don't do well, I get zip.

14          In any event, I ended up going out --

15  the rest you know.  I went to see the machine the

16  first time, they couldn't run it, they finally said

17  come now.  I came back to see it, they couldn't run

18  it.  When TJ first came to us the machine was --

19  they want to sell it for a million, then it was a

20  half a million, then it was 250, and then it was --

21  when I got there the second time I looked at that

22  guy and I said I just flew my airplane here and you

23  can take that machine and shove it, and we bought it

24  for $35,000.

25      Q.    And these trips that you're talking about

M. Herman - by Ms. DiVittore

61

```
 1    to go see it, those are the trips that --

 2         A.    That they reimbursed me for.  And by the

 3    way, if you look real closely, you'll see I gave --

 4    I gave the money away to charity.

 5         Q.    At some point you decided to move forward

 6    -- strike that.

 7               How did Mr. Ortiz get involved in the

 8    -- with you in checking out the machine?

 9         A.    I called him up and I said, Manny, what

10    are you doing, and he said oh, I'm busy with this

11    and looking at the art business and I said oh, we're

12    going to do something together.  And he said nah,

13    I'm too busy.  And I said that's bullshit, you're

14    going to do what I tell you to do.

15         Q.    And what were you going to do with Mr.

16    Ortiz; what was your plan when you contacted him?

17         A.    At that time I believe -- I can't be a

18    hundred percent sure but he was shutting down that

19    -- whatever the name of that company he said.  And I

20    thought that he had some empty space.  I think even

21    Rob told me he probably -- when he shuts down he

22    could have some empty space and put the machine

23    there and figure out what the hell it was.  And so

24    that's how that began.

25         Q.    And this was sometime in 2016, if you
```

M. Herman - by Ms. DiVittore

62

1    recall?

2        A.    It was his birthday.  I'd have to go back

3    and look.

4        Q.    But Mr. -- or your son --

5        A.    My son.

6        Q.    -- and NAC dropped out of the

7    discussions, correct?

8        A.    Well, they dropped out of the

9    discussions, but I certainly was discussing what was

10   going on with him back and forth all the time.  He's

11   very smart.

12            MR. BERARDINELLI:  Just to reflect that

13   he pointed to Rob Herman when he --

14       A.    My son Rob Herman, very smart.

15       Q.    So you and Mr. Ortiz went to look at the

16   equipment.

17       A.    With Pat Donahue.

18       Q.    And you were working with Mr. Ortiz when

19   he decided that he wanted to move forward and buy?

20       A.    That's not how it -- that's not

21   exactly -- Manny is a lot younger than me, and he

22   and I don't remember the same things all the time.

23   When I met Pat Donahue with Rob that day, Pat told

24   me he had a patent on the machine.  That was the

25   first thing he told me, amongst other things.  And

M. Herman - by Ms. DiVittore

1   as it turned out, he had a patent pending that was

2   turned down twice. And I went out to look at the

3   machine. And the first thing I did was I called my

4   old patent attorney who had retired who had worked

5   in the patent office and also obtained the patents

6   for Bobby and I over those years previous, and he

7   came out on the second visit, drove up from

8   Virginia, Washington area, and he looked at it and

9   he got a good picture of it and we went to lunch and

10   he said I'll get you a patent. And on his word,

11   because I had other -- I had lots of ideas going,

12   making mail, okay, we had heard from the SITMA

13   people that they were asked to make -- duplicate

14   this machine. These are the big boys, the billion

15   dollar companies. And they couldn't because Fry

16   owned it and he had a patent pending, a horse and

17   the cart. And so that was the decision about --

18   because I had -- I had contemplated reproducing the

19   machine. Anyway, long story short, that was it.

20   When Herman Hohauser said I'll get you a patent, I

21   said to Manny go for it.

22       Q.   When Herman -- when who --

23       A.   Herman Hohauser, H-O-H-A-U-S-E-R.

24   Hohauser.

25       Q.   Did you have discussions with Mr. Ortiz

64

1    about how the business would be set up?

2         A.    What business?

3         Q.    The business that was going to own this

4    machine.

5         A.    Um, I might have.  I don't really recall.

6    I've never operated that way.  So the whole idea was

7    get the machine, let's get it somewhere, let's see

8    what the hell it's got, because we're doing this

9    blind.

10        Q.    Company was ultimately called IFM; is

11   that right?

12        A.    You want to know what it stands for?

13        Q.    Sure.

14        A.    It's Fucking Magic.

15        Q.    And you were not a member of IFM, LLC; is

16   that right?

17        A.    That's correct.

18        Q.    And you were not an officer?

19        A.    That's correct.

20        Q.    And you were not an employee.

21        A.    In spite of what it said on that website,

22   that's correct.

23        Q.    But you were assisting Mr. Ortiz as he

24   moved forward with buying the machine and starting

25   this company.

65

```
 1      A.    Absolutely.

 2                         * * *

 3      (MH Deposition Exhibit 7 was marked for

 4                   identification.)

 5                         * * *

 6      Q.    I'll show you what we've marked as

 7   Exhibit 7.

 8            MR. BERARDINELLI:  Now I remember,

 9   Stephanie, when you complained how small we printed

10   these out.  And I apologize again.

11            MS. DIVITTORE:  Off the record.

12                         * * *

13   (Whereupon, an off-the-record discussion was held.)

14                         * * *

15      A.    (Witness reviewing.)  Okay.  Ask away.

16   BY MS. DIVITTORE:

17      Q.    I'm looking at Exhibit 7.  Do you

18   recognize this as an e-mail --

19      A.    No.

20      Q.    -- exchange between you and Mr. Ortiz on

21   January 8th of 2017?

22      A.    I see it, yes.

23      Q.    And you were writing to Mr. Ortiz, "We

24   should discuss the makeup of the IFM company as to

25   how we are treating it for tax purposes."
```

M. Herman - by Ms. DiVittore

66

1           Do you see that?

2     A.    I see it.

3     Q.    What does that mean?

4     A.    It means that you don't understand how we

5  talk in let's say Brooklyn or New York or even the

6  president.  When I'm flying along in the airplane

7  all by myself and I'm talking to the center, I say

8  we are requesting a change, we are this or we are

9  that, and as a boat is referred to a her.  So I

10  can't say to you exactly what that conversation was

11  about, but it is what it is and --

12     Q.    Well, what did you mean about the IFM

13  company and tax purposes?

14     A.    Well, sooner or later, if it was going to

15  be a company and it was going to be bought, I'm

16  assuming at this point because I don't recall this

17  conversation, but I would assume that maybe some

18  discussion would be appropriate as to how we was

19  going to handle it, because he at that point was

20  already asking me about getting financing.

21     Q.    Tell me about those discussions.

22     A.    He wanted -- needed money to --

23          MR. BERARDINELLI:  Can we just clarify

24  who "he" is?  Go ahead.  When you use he or she, it

25  can get confusing.  Try and use the names.  Sorry.

M. Herman - by Ms. DiVittore

67

1     Q.   Mr. Ortiz; is that right?

2     A.   Yeah.  Manny.  How about that?  Mr. Ortus

3  as my phone says.  When you say Siri, call Manny,

4  it's Mr. Ortus.

5         It sounds to me from reading this,

6  because I don't remember, it sounds to me that it

7  would have been the idea you're looking for funds,

8  you want to buy this machine from them, meaning Fry,

9  what are you thinking, you know, got to think about

10  what are you going to, is it going to be a company,

11  is it going to be a piece of equipment somewhere,

12  it's going to be a test.

13    Q.   Then it says you've apparently already --

14  excuse me.  It says, "You've apparently figured it

15  out as you are doing it through Logan MKT" -- is

16  that short for marketing?

17    A.   Manny already said it was Logan

18  Marketing.  I didn't even know what Logan Marketing

19  was other than a name.

20    Q.   You don't know about --

21    A.   Back then Logan Marketing was the name of

22  his grandson, and I guess he made a company named

23  after his grandson.  I know what it is now, of

24  course, but you're asking me way back when.  I

25  couldn't have cared less way back when.

68

1    Q.    Was there a time that you became involved

2  with Logan Marketing?

3    A.    No.

4    Q.    Does your wife own 25.4 percent of --

5    A.    That's right.

6    Q.    Please let me finish my question.

7          Does your wife own 25.4 percent of

8  Logan Marketing?

9    A.    I'm not sure of the exact amount, but

10 close to it, yes.

11   Q.    How did your wife come to have an

12 ownership interest in Logan Marketing?

13   A.    She -- when Logan was -- she, meaning my

14 wife, is 30 years younger than me.  I'm 79 years

15 old.  And so I provided the funds from the airplane

16 that we both own so that she -- so that she, meaning

17 my wife, Maria, would take the membership and learn

18 the business and if I croak, you know...

19   Q.    You said take the funds from the airplane

20 that we both own; what does that mean?

21   A.    Well, my airplane -- I went to the

22 bank -- I'll even step back one because my son is

23 here, if you don't mind.  When he needed money to

24 pay his fines for the feds, he kept saying to me why

25 don't you loan money on the airplane.  And I went to

M. Herman - by Ms. DiVittore

69

1    PNC who had the thing, and I never missed a payment

2    in all the years, and they wouldn't give me the

3    money because I was a felon.  And eventually I found

4    through a friend who was in the aircraft business,

5    he sent me to another place to get money and I

6    refinanced the airplane.  I got him the million two

7    -- no that came from Sofitel, I'm sorry.  I got

8    him -- I got money out of the airplane to put into

9    what eventually became Logan Marketing, which is

10   only this year or something.  The airplane is both

11   of ours, so it's hers, it's her money.

12        Q.    Are there loan documents demonstrating

13   that?

14        A.    That I loaned money from a bank, a couple

15   million dollars, yes.  Absolutely.

16        Q.    Which bank?

17        A.    I don't know that is any of their

18   business.

19             MR. BERARDINELLI:  Can we talk for one

20   second?

21             MS. DIVITTORE:  Sure.

22             MR. BERARDINELLI:  The loan you're

23   questioning Mr. Herman about has nothing to do with

24   IFM, doesn't involve financing related to IFM.  I've

25   given a little leeway to sort of ask these

M. Herman - by Ms. DiVittore

70

1     background questions, but at this point we're not

2     going to reveal anything related to these financing

3     transactions that don't bear on IFM.

4                MS. DIVITTORE:  Well, Bear Air and

5     Chiefeast clearly are related to this lawsuit.  And

6     if Bear Air and Chiefeast have financing or pledged

7     collateral or took out financing that was used to

8     fund Logan Marketing, I think it's directly relevant

9     to this lawsuit.

10                MR. BERARDINELLI:  Logan Marketing has

11    nothing to do with this lawsuit.  Logan Marketing is

12    not connected to IFM; you heard him talk about that

13    this morning.  If you want to ask him questions

14    about whether he has used the plane at all to

15    finance IFM or to help obtain funds for IFM, I'll

16    permit him to answer those questions.

17                MS. DIVITTORE:  So you're instructing him

18    not to answer?

19                MR. BERARDINELLI:  I am.

20                But I'll allow him to answer anything

21    related to financing of IFM.

22          Q.    Did Chiefeast, LLC, which you claim you

23    were the sole member, contribute any funding to IFM?

24          A.    Um, the answer would be directly -- when

25    I say directly no, I mean it was no reason for it

M. Herman - by Ms. DiVittore

71

1    but sometimes -- sometimes -- maybe I'm mixing a

2    couple things up.  Sometimes Doug, when he sent

3    money somewhere, but he couldn't send Chiefeast

4    money.  I don't think so but...  if you can show me

5    something otherwise, then maybe it did.

6                        * * *

7         (MH Deposition Exhibit 8 was marked for

8                    identification.)

9                        * * *

10   A.     (Witness reviewing.)

11          MR. BERARDINELLI:  What are we up to?

12   Eight?

13          MS. DIVITTORE:  Eight.

14          THE WITNESS:  What does that have to do

15   with IFM?

16   BY MS. DIVITTORE:

17        Q.    Do you recognize Exhibit 8 as an e-mail

18   from you to Susan Bender at her NAC e-mail address?

19        A.    Yeah.  Yes.

20        Q.    Subject:  Doug Holthaus?

21        A.    Right.

22        Q.    "Please confirm wire transfer

23   instructions for Chiefeast.  And mark funds coming

24   in as a loan which it is."

25        A.    Um, it says what it says.  I'm not

M. Herman - by Ms. DiVittore

72

1    arguing with you.

2       Q.    And that was -- I'm not sure if I said

3    the date, January 30, 2017; is that correct?

4       A.    That's what it says on the paper.

5       Q.    Do you know what loan this is

6    referencing?

7       A.    No.  I don't.

8                         * * *

9       (MH Deposition Exhibit 9 was marked for

10                  identification.)

11                        * * *

12      Q.    Show you what we've marked as Exhibit 9.

13      A.    (Witness reviewing.)  Okay.

14      Q.    Are you familiar with the e-mail address

15   onecheckplease@gmail.com?

16      A.    Yes.

17      Q.    That's your wife's e-mail address?

18      A.    It is.

19      Q.    Do you recognize this as an e-mail from

20   Susan Bender to your wife, May 1, 2017, subject,

21   wire to IF Mail LLC?

22      A.    Yeah.

23      Q.    Sue is telling Maria that you asked her

24   to wire $15,000 to IFM; is that right?

25      A.    That's correct.

M. Herman - by Ms. DiVittore

73

1     Q.    Do you recall why Chiefeast is wiring
2     $15,000 to IFM?
3     A.    Because Manny asked to borrow $15,000,
4     and Sue would have taken it from wherever there was
5     cash.  She could have taken it from Bear Air.  It
6     wouldn't matter.  It's all my money.  It's all
7     personal money.
8     Q.    If you look at the second page, those are
9     the wire instructions from your Chiefeast account to
10    IFM?
11    A.    Okay.  Doesn't mean anything to me.  If
12    it is it is.
13    Q.    And this was a loan; is that your
14    testimony?
15    A.    Yeah.
16    Q.    Are there loan -- was there a loan
17    agreement?
18    A.    Absolutely not.
19    Q.    So it was verbal?
20    A.    Read page 4 from Manny to me.  Pick -- I
21    was reading what I see here.  The original message
22    started out, "Mike, I will" -- this is from Manny to
23    me -- or me to Sue.  "Mike, I will take you up on
24    your offer to have Sue wire us some cash.  Can you
25    have her send 15K to cover" payroll -- "printer and

74

1    payroll. Will return when money comes in."

2              And here's the wiring information that

3    was sent and I passed it on to Sue.

4         Q.    Did IFM ever repay those amounts?

5         A.    I hope so. I don't know.

6         Q.    You don't know whether you --

7         A.    I don't follow up. If Manny said he's

8    going to send it back, he's going to send it back.

9    I don't do any of the books. I haven't had one of

10   my own personal checks with my signature on it in 40

11   years.

12        Q.    So as we sit here today, you don't know

13   whether IFM --

14        A.    I don't.

15        Q.    Please let me finish my question.

16              You don't know whether IFM sent you a

17   check or wired funds to repay this $15,000?

18        A.    That's correct.

19        Q.    Would you be able to find that

20   information in your records?

21        A.    I would ask my wife to take a look.

22        Q.    And Mr. Herman, Susan Bender is an NAC

23   employee; is that right?

24        A.    Yes.

25        Q.    And she was your personal assistant for a

M. Herman - by Ms. DiVittore

75

1    long time?

2         A.    Yes.

3         Q.    And she continued to provide services to

4    you and your other companies after 1995?

5         A.    '95 being --

6         Q.    When you stepped away from the company.

7         A.    Well, I'm still getting paid by the

8    company, so the answer is yes.

9         Q.    And you continue to use Sue Bender for

10   services for your -- you, personally, and your

11   businesses after you signed the retirement agreement

12   in 2013; is that right?

13        A.    That's correct.

14        Q.    Mrs. Bender was never an employee of any

15   of your other businesses, correct?

16        A.    That is correct.

17        Q.    And she didn't receive payment as an

18   independent contractor?

19        A.    That's incorrect.

20        Q.    You issued 1099s to Mrs. Bender?

21        A.    No.  But I gave her -- I gave her

22   bonuses.  Rob knows I've done that.  I did that even

23   when she was working there for them.  She also did

24   work -- she also does work for a company that my

25   nephew and I own.  I believe she still -- I don't --

M. Herman - by Ms. DiVittore

85

1   things he should have done.  And I'm not the only

2   one who was left in a bit of a mess with his

3   practice.

4        Q.    Who else was left in a mess?

5        A.    I don't know.  I can't tell you who they

6   are, but I do know from the family that there are

7   other problems.

8        Q.    When did you speak with Mr. Bish?

9        A.    In the last couple of weeks.

10       Q.    Have you spoken to Mr. Bish since we

11  started these depositions on Tuesday?

12       A.    Today, no.  Absolutely not.

13       Q.    Since we started these depositions on

14  Tuesday have you spoken with Mr. Bish?

15       A.    No.

16       Q.    Did you inform Mr. Bish that there's

17  litigation pending and that IFM, while not a party,

18  is part of it?

19       A.    I do not think so.  I do not believe I

20  did.

21       Q.    Would you agree with me that IFM is not

22  currently operating?

23       A.    Give me your definition of operating.

24       Q.    Does IFM currently have any employees?

25       A.    Well, Manny said no.  First I heard of

M. Herman - by Ms. DiVittore

86

1    it.

2         Q.    Who do you believe is still working for

3    IFM?

4         A.    I don't believe anybody.  I don't think

5    about that.  When the time comes that I can get that

6    machine set up somewhere and assembled and go back

7    to work on it, that's all I care about.  In between

8    now and then, couldn't give a damn.

9         Q.    Did you, Bear Air, Chiefeast, Bariloche

10   provide any consulting or transportation services

11   for Sofitel Investments?

12              MR. BERARDINELLI:  Object to the form.

13        A.    Yes.

14        Q.    Tell me about that.

15        A.    I do work for -- the money that has been

16   loaned to me, one of my obligations is to see to it

17   that that machine becomes a reality.

18        Q.    And my question was whether you, Bear Air

19   or Chiefeast have provided transportation or

20   consulting services to Sofitel?

21              MR. BERARDINELLI:  Object to the form.

22        A.    I don't really understand what you're

23   asking.

24        Q.    Have you taken your plane and flown at

25   Sofitel's request?

89

1    heard it.  But you're asking him whether he heard

2    something in somebody else's deposition without

3    being specific as to what it is, and I just don't

4    think that's a proper question.

5              MS. DIVITTORE:  It's a speaking objection

6    and we've reserved objections to form so...

7              MR. BERARDINELLI:  Sure.  You've gotten

8    argumentative with him now, so I'm not going to let

9    him answer any more on this.

10             MS. DIVITTORE:  Because he's

11   intentionally not answering my question, which is a

12   yes or no question.

13             MR. BERARDINELLI:  What would you like?

14   I'll stipulate to it if you tell me what you'd like.

15   That he was in the room when Manny testified?

16             THE WITNESS:  Have her ask me the yes or

17   no question.

18             MR. BERARDINELLI:  I'm serious.  I just

19   want to move this along.  What fact would you like

20   on record --

21        Q.   How about this.  You were involved in

22   virtually every aspect of the formation and

23   operation and IFM; is that correct?

24        A.   No.

25             MR. BERARDINELLI:  Object to the form.

M. Herman - by Ms. DiVittore

90

1      A.     No.   I was involved but not in everything

2   that IFM did.

3      Q.     You helped Mr. Ortiz secure the funding.

4      A.     I -- Doug Holthaus secured the funds,

5   yes.

6      Q.     But you introduced --

7      A.     Yeah, of course.

8      Q.     Let me finish my question.

9             You introduced Mr. Ortiz to Doug

10  Holthaus.

11     A.     Yes.

12     Q.     And Mr. Ortiz asked you to come along to

13  all of the visits to see the equipment.

14     A.     I think it was the other way around.  I

15  met PJ through my son, told me where the equipment

16  was.  I said Manny, I'd like you to get involved in

17  this.  You have a business, I understand from Rob,

18  that you're not running.  I think it was the other

19  way around.

20     Q.     But my point is, the two of you --

21     A.     The three of us went, PJ and myself and

22  Manny, on the first visit.  And the second visit my

23  -- I'm repeating myself again -- my patent attorney

24  came.

25     Q.     And when -- after IFM -- excuse me --

M. Herman - by Ms. DiVittore

1    after Sofitel agreed to provide funding to IFM, you

2    were involved in the requests for funding; is that

3    correct?

4        A.    Of course.

5        Q.    And if IFM wanted money from Sofitel, Mr.

6    Ortiz would e-mail you and then you would reach out

7    to Attorney Holthaus?

8              MR. BERARDINELLI:  Object to the form.

9        A.    Or he would e-mail Attorney Holthaus or

10   he would e-mail Sue or he'd e-mail anybody but

11   himself.

12       Q.    And what is your understanding of the

13   agreement between IFM and Sofitel regarding the

14   funds advanced to IFM?

15       A.    When the machine is up and running, they

16   would be getting a royalty for every thousand pieces

17   that came out of the machine over an X period of

18   time.  I don't know the detail, because I don't

19   think they ever concluded -- they never concluded

20   the detail, just got started with it, and that was

21   where we --

22       Q.    So does IFM have to repay the principal?

23       A.    No.  It would -- it was a royalty deal.

24       Q.    Did the rights to the royalty end after

25   the principal and some amount of interest were

M. Herman - by Ms. DiVittore

92

1    repaid?

2           A.    Double the amount.

3           Q.    What do you mean?

4           A.    If they lent them a thousand dollars,

5    they would get 2,000 back.  That was my

6    understanding in the beginning.  If they -- if they

7    loaned them a million dollars, they would get

8    royalties of 2 million back.

9           Q.    And when did these discussions take place

10   -- or these negotiations take place?

11          A.    I have no recollection of that.

12          Q.    But you were involved and understood?

13          A.    I was not involved in all of the

14   discussions, no.

15          Q.    Were you involved in any e-mail

16   correspondence?

17          A.    Maybe perhaps I might have been.  I don't

18   -- I don't recall.  If you have some, put it on the

19   table.

20          Q.    That's what I'm asking you.  Do you have

21   any?  Because we don't.

22                MR. BERARDINELLI:  I'm going to object to

23   that comment.  There are e-mails that discuss a

24   royalty arrangement with Sofitel, in both your

25   discovery and ours, so...

M. Herman - by Ms. DiVittore

93

1          MS. DIVITTORE:  Where?  Because other

2     than document production that --

3          MR. BERARDINELLI:  If you look through

4     the 20,000 pages that you guys dumped on me in the

5     last week, you would find them, and they're in our

6     production as well.

7          MS. DIVITTORE:  The only production I

8     have received that concerns any royalty agreement

9     between Sofitel and IFM are MH777 --

10          MR. BERARDINELLI:  That's not accurate.

11          MS. DIVITTORE:  -- through MH786, which

12     you provided, I think, Wednesday.

13          MR. BERARDINELLI:  I disagree with that

14     statement.  There are e-mails that reference a

15     royalty agreement.  They might not have the details

16     of it, but e-mails that reference the royalty

17     agreement that you've had since June and that you

18     then produced back to us in a recent production.

19     Q.     Did you have verbal discussions with

20     anybody concerning this alleged royalty agreement

21     between IFM and Sofitel?

22          MR. BERARDINELLI:  Can I hear that again?

23     I'm sorry, I wasn't paying attention, I apologize.

24                    * * *

25     (Whereupon, reporter read pending question.)

94

1                              * * *

2              MR. BERARDINELLI:  Yes or no.  I'm

3    worried about potential attorney-client, but yes or

4    no.

5       A.    Read it again for me.

6                              * * *

7       (Whereupon, reporter read pending question.)

8                              * * *

9       A.    Yes.

10      Q.    With whom did you have verbal --

11      A.    But I want to make note that she said

12   "alleged."

13      Q.    With whom did you have verbal discussions

14   concerning the royalty agreement between IFM and

15   Sofitel?

16      A.    Doug Holthaus, Manny Ortiz.

17      Q.    As we sit here --

18      A.    There may be somebody else in there, I

19   don't -- but I certainly spoke to those two.

20      Q.    As we sit here today, has there ever been

21   an executed royalty agreement, to your knowledge,

22   between IFM and Sofitel?

23      A.    No.

24      Q.    Did you ever provide Mr. Ortiz with a

25   draft royalty agreement between IFM and Sofitel?

M. Herman - by Ms. DiVittore

95

1      A.    Me?  No.

2      Q.    When you had discussions with Mr. Ortiz

3   concerning this royalty agreement, was Mr. Holthaus

4   part of the actual discussion, or did you separately

5   discuss it with Mr. Ortiz?

6            MR. BERARDINELLI:  Object to the form.

7      A.    When I discussed this with Manny, it was

8   about we get the machine running, what is the

9   market, how much is it -- how much is going to go

10  through the goose.  In other words, it runs for an

11  hour, it makes X amount of pieces, you get X amount

12  of dollars versus other types of equipment.  And

13  what would they -- what would be fair so that they

14  get their investment because we expected, obviously,

15  that the machine -- we didn't know what we had, so

16  we had to expect something, so you come up with a

17  pro forma or an idea.  And that's all.

18     Q.    Was it your idea to structure it as a

19  royalty agreement?

20     A.    No, not that I remember that, no.  No, I

21  think it was -- I think, if I remember correctly, it

22  was Doug Holthaus's.

23     Q.    Let's talk about this.  You said that

24  Attorney Holthaus provided legal services for you;

25  is that right?

96

1    A.    From time to time, sure.

2    Q.    Would you get retainer or fee agreements?

3    A.    No.  He'd send me a bill.

4    Q.    And there was testimony, I believe, that

5  Doug Holthaus was representing IFM as well; is that

6  your understanding?

7    A.    In the beginning, yes.

8    Q.    Did that stop at some point?

9    A.    I -- well, it certainly -- it stopped

10 because he was sick and wasn't performing.

11   Q.    Prior to Mr. Holthaus being able to --

12 unable to provide legal services?

13   A.    It stopped somewhere, but I can't tell

14 you where.

15   Q.    And was, to your knowledge, Attorney

16 Holthaus also counsel for Sofitel?

17   A.    His dealings with Sofitel have nothing to

18 do with me.

19   Q.    That wasn't my question.

20   A.    What's the question?

21   Q.    My question was, was Attorney Holthaus,

22 to your knowledge, also counsel for Sofitel?

23   A.    I do not know that answer.

24   Q.    Do you know whether he had an ownership

25 interest in Sofitel?

M. Herman - by Ms. DiVittore

118

1              MR. BERARDINELLI:  Ten was -- I might

2    have jumped to --

3                       * * *

4    (Whereupon, an off-the-record discussion was held.)

5                       * * *

6    BY MS. DIVITTORE:

7         Q.    Show you what we've marked, Mr. Herman,

8    as Exhibit 12.  It's a September 1, 2017, e-mail

9    exchange between you and Mr. Ortiz concerning wiring

10   instructions for $50,000 to go to Capital Mailing

11   Equipment.  Do you see that?

12        A.    Yeah -- yes.

13        Q.    Do you recall, was this in relation to

14   IFM?

15        A.    It is.

16        Q.    Do you know why Capital Mailing was

17   getting 50,000?

18        A.    As a deposit on some equipment that

19   either he was going to buy or renting.  I think it

20   was about purchasing.

21        Q.    And you wrote to Mr. Ortiz, "Should not

22   the 50,000 go through IFM's account.  At some point

23   we'd have to show the depreciation."

24              What do you mean by that?

25        A.    Well, if you have a business and you buy

M. Herman - by Ms. DiVittore

119

1 equipment, it gets depreciated, and how do you show

2 depreciation if the money came from somewhere else.

3 And he said, "Yes, we can account for it."

4         All Manny did was use me. It was

5 easier for him to use me as the conduit. I was like

6 a secretary to him. Anyhow, that's -- that's the

7 meaning of that.

8                      * * *

9      (Whereupon, a brief recess was taken.)

10                      * * *

11 BY MS. DIVITTORE:

12      Q. Very briefly. Your son Michael R. Herman

13 came to work for IFM sometime in 2017; is that

14 correct?

15      A. Around May, I think it was.

16      Q. Did you ask Sue to wire your son $10,000

17 prior to him coming to work for IFM?

18         MR. BERARDINELLI: Object to the form.

19      A. If she did, then I asked her.

20      Q. Do you know why you would have directed

21 $10,000 to your son?

22      A. Absolutely. You asked me if I would

23 know, and I'm saying yes, I know.

24      Q. Why did you ask -- why did you make a

25 transfer of $10,000 to your son?

M. Herman - by Ms. DiVittore

120

1        A.      Because from time to time I do that

2    because he always -- he got into the hole, wasn't

3    making enough money, he was traveling -- was going

4    to have to travel back and forth, and I didn't want

5    him coming to work for us, or work for -- with

6    having bills and worrying and leaving his family

7    behind.  I just sent him 15 grand.  The other day I

8    had Maria send him money to help him out because he

9    paid his own health insurance because there was

10   none.  As I have given to all of my children.

11       Q.      My client thought you answered this, I

12   didn't, so I'm going to ask again.  So I apologize

13   if it's duplicative.

14       A.      Okay.  Ask it.

15       Q.      You heard Mr. Ortiz' testimony regarding

16   IFM and your involvement, correct?

17       A.      I think I admitted in other documents to

18   you guys that I was involved with IFM.

19       Q.      Is it true that you and Mr. Ortiz agreed

20   that to the extent that IFM made profits, they would

21   be divided between the two of you?

22       A.      That's what he said, and that's what he

23   meant.  By the time this starts to generate, I'm

24   sure there will be family people who will be

25   involved, you know.  I mean, you would have to ask

121

1   him what he meant by that, but yes, the general idea

2   is we'll get this thing going and then we will worry

3   about what we're going to do.

4       Q.   But did you have any discussions with him

5   that profits that were made from the machine would

6   be divided -- that you would share in those profits?

7       A.   Of course.  Yes.

8            MS. DIVITTORE:  That's all I have.

9            MR. BERARDINELLI:  And I don't think you

10  asked it before.

11           MS. DIVITTORE:  Okay.

12           MR. BERARDINELLI:  I don't think.

13           THE WITNESS:  You don't think what?

14           MR. BERARDINELLI:  I don't think she

15  asked that.

16           Why don't we take two minutes?  I will be

17  less than two minutes after we take the two minutes.

18  Okay.

19           THE WITNESS:  After we do what?

20           MR. BERARDINELLI:  I want to take a break

21  so I can look at my notes.

22           (Whereupon, a brief recess was taken.)

23                 -----

24

25