# EXHIBIT 3

1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3                          * * *

4    NORTH AMERICAN COMMUNICATIONS,      )
     INC.,                               )
5              Plaintiff,                )
                                         )   NO. 3:17-CV-157
6              vs.                       )
                                         )
7    MICHAEL HERMAN,                     )
                                         )
8              Defendant and            )
               Counterclaim-Plaintiff    )
9                                        )
               vs.                       )
10                                       )
     NORTH AMERICAN                      )
11   COMMUNICATIONS, INC.,               )
     ROBERT HERMAN and                   )
12   NICHOLAS ROBINSON,                  )
                                         )
13             Counterclaim-Defendants.  )
                                         )

14

15                          * * *

16              DEPOSITION OF EMANUEL ORTIZ

17                          * * *

18              FRIDAY, NOVEMBER 9, 2018

19                          * * *

20

21      REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
       WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY
22

23

24

25

E. Ortiz - by Ms. DiVittore

13

1      Q.     And did you have the opportunity to
2   review these documents before they were --
3      A.     I recall having a discussion about them.
4      Q.     And did you work -- they're from Attorney
5   Ed Borden; is that correct?
6      A.     Correct.
7      Q.     And did IFM and Logan Marketing retain
8   Attorney Borden to represent IFM and Logan in these
9   proceedings?
10      A.     IFM.
11            MR. BERARDINELLI:  Stephanie, you should
12   ask -- I forgot to reserve our -- reserve all
13   objections except as to form.
14            MS. DIVITTORE:  I'm sorry.  I forgot.
15   Agreed.
16            MR. BERARDINELLI:  No, I typically do it,
17   so you didn't forget, I just...
18      Q.     So Attorney Borden represents IFM with
19   respect to the subpoena?
20      A.     Correct.
21      Q.     If you look at the response in Exhibit 3,
22   No. 3 -- sorry -- Exhibit 4.  I apologize.
23            MR. BERARDINELLI:  The Logan one?
24            MS. DIVITTORE:  Yes.  I apologize, I'm
25   not organized.

E. Ortiz - by Ms. DiVittore

14

1        Q.     Exhibit 4, document request one asks for

2    a list of owners, officers and employees of Logan

3    Marketing Group, LLC.  Do you see that?

4               MR. BORDEN:  On page 3.  The 1s and 2s

5    and 3s.

6        A.     I see it.

7        Q.     And the response, the last sentence

8    indicates that Maria Herman, Michael Herman's

9    spouse, owned a 25.4 percent interest in nonparty

10   defined as Logan Marketing; is that right?

11       A.     That's correct.

12       Q.     Did you provide that information to

13   Attorney Borden?

14       A.     Either myself or our accountant.

15       Q.     Do you know who the other 74.6 percent

16   owners of Logan Marketing are?

17       A.     I do.

18               MR. BORDEN:  Objection.  Logan Marketing

19   -- read the pleadings, Logan's not a party to this

20   case as we objected here.  We continue to object.

21   And I can tell you that Mr. Ortiz is not going to

22   answer questions about ownership except to -- except

23   as far as in this answer.

24               MR. BERARDINELLI:  And I will -- I'll

25   join in that objection, but I will stipulate -- if

E. Ortiz - by Ms. DiVittore

18

1          MR. BERARDINELLI:  I will stipulate to

2    that as well.  I can't speak for why Mr. Borden

3    listed the 25.4.

4          MR. BORDEN:  I'll just note the obvious

5    thing, and that is that, in fact, that neither

6    Mr. Herman nor IFM holds any interest in Logan is

7    also part of the answer.

8          MS. DIVITTORE:  Not certain why you are

9    putting facts of record; I understand we had an

10   objection, but I don't know that that's appropriate.

11         MR. BORDEN:  Well, Mr. Berardinelli

12   proffered a stipulation as to certain things, and

13   I'm just noting that Mr. Herman -- or excuse me --

14   Mr. Ortiz and Logan have already stated that neither

15   Mr. Herman nor IFM hold any ownership interest in

16   Logan.

17   BY MS. DIVITTORE:

18      Q.    Mr. Ortiz, if you'd look at document

19   No. 3, which is the objections and responses from

20   your counsel to the IFM subpoena, go to page 3.

21   Question 4 asks for "any and all payroll or other

22   financial records for IFM.US, LLC, which list or

23   indicate payments to Michael Herman."  Do you see

24   that?

25      A.    Correct.  I see it.

E. Ortiz - by Ms. DiVittore

19

1       Q.    And it indicates "responsive documents

2   will be produced."  Do you see that?

3       A.    Okay.  I see it.

4       Q.    Do you know whether documents were

5   produced that indicate payments to Mr. Herman?

6       A.    I don't believe there were any documents.

7       Q.    So IFM made no payments to Mr. Herman?

8       A.    Mike -- IFM has made no payments to

9   Michael Herman, other than the $25,000 check that

10  you are quite aware of.

11      Q.    Which $25,000 check?

12      A.    It's part of the information that was

13  provided.  We reimbursed Mike for his travel in the

14  beginning.  You have records of that, I'm sure of

15  that.

16                       * * *

17      (MO Deposition Exhibit 5 was marked for

18                    identification.)

19                       * * *

20      Q.    I'll show you what we've marked as

21  Exhibit 5.

22      A.    Okay.

23      Q.    Do you recognize this document?

24      A.    Yeah.  I'm familiar with this document.

25      Q.    And did you draft this?

E. Ortiz - by Ms. DiVittore

22

1      A.    IF Mail.

2                     * * *

3       (MO Deposition Exhibit 6 was marked for

4                 identification.)

5                     * * *

6             MS. DIVITTORE:  Can we go off the record?

7                     * * *

8     (Whereupon, an off-the-record discussion was held.)

9                     * * *

10            THE WITNESS:  You know what, now I need

11    my glasses.

12            MR. BERARDINELLI:  Is that 6?

13    BY MS. DIVITTORE:

14       Q.    Show you what we've marked as MO

15    Exhibit 6.

16            MR. BERARDINELLI:  Give us one second,

17    Steph, please.

18            MS. DIVITTORE:  Sure.

19       A.    Okay.

20       Q.    Do you recognize that as an e-mail

21    exchange that involves you, Mr. Herman, and Susan

22    Bender?

23       A.    I do.  I don't recall it, but I do.

24       Q.    It was November 28, 2016, the top date.

25       A.    Okay.

E. Ortiz - by Ms. DiVittore

23

1        Q.      Is that correct?

2        A.      It says so.

3        Q.      And it attaches an e-mail from Mrs.

4    Bender?

5        A.      Okay.  Is that the attachment?

6        Q.      Yes.

7        A.      Okay.

8        Q.      Is that correct?

9        A.      That's what I'm reading.

10       Q.      And you would agree with me that Susan

11   Bender is an employee of North American?

12       A.      Correct.

13       Q.      And this is discussing the information

14   necessary to form IF-Mail.com, LLC; is that right?

15       A.      Correct.

16       Q.      Is that the original name of the

17   business?

18       A.      That was the original name.

19       Q.      And you were working with Mr. Herman

20   about how to form this company?

21       A.      That's correct.

22       Q.      And you indicated that Mrs. Ortiz was and

23   is the only owner of IFM?

24       A.      Correct.

25                        * * *

E. Ortiz - by Ms. DiVittore

25

1    Jersey.

2        Q.    So when the -- when these documents were

3    filed in March of 2017, did Patrick Donahue have any

4    ownership interest or was an officer or director of

5    IFM?

6        A.    Patrick Donahue was an employee of IFM.

7        Q.    What about David Halprin?

8        A.    David Halprin is an attorney for IFM.

9        Q.    And then Logan Marketing Group?

10       A.    That is incorrect.  Logan has nothing to

11   do with IFM.

12       Q.    So let's turn back to IFM.  Would you

13   agree with me that your discussions with Mr. Herman

14   about the business began sometime in 2016?

15       A.    Sometime in 2016.

16       Q.    Can you tell us about that?

17       A.    That's a long story, and I think your

18   client can probably better explain it because it all

19   starts with the introduction of Rob to Mike about a

20   piece of technology that we acquired.  So what time

21   frame was that?  July, August?

22       Q.    How did it come out?  Come about?

23       A.    Rob introduced --

24             MR. BORDEN:  What's the question?

25       Q.    How did it come about?  How did you

E. Ortiz - by Ms. DiVittore

26

1    become involved?  How did you learn about the

2    machine?

3        A.    Rob introduced Mike to Pat Donahue.  Mike

4    called me, said there's a unique piece of

5    technology, let's go look at it.  We went to look at

6    it.  Rob backed out of participating in the purchase

7    of the technology.  We decided to go forward.  We

8    purchased it.  We decided to create a business for

9    the technology.  And that's the long and short of

10   it.

11       Q.    And can you explain the machine or the

12   technology, what it does and how it's new

13   technology?

14       A.    It's a piece of equipment that was

15   designed by Pat Donahue that does -- that -- it

16   replicates what an in-line package would be created

17   on a continuous web press.  It replicates it in a --

18   a match-inserting piece of technology.  You'll take

19   a form, you create a pre-assembly, you run it

20   through the machine, it keeps everything in order,

21   allows you to do match mail so it's Stephanie,

22   Stephanie, Stephanie.  Okay?  It also allows you to

23   do selective inserting; so you might get a, you

24   know, an insurance piece and Tera might get a health

25   care piece.  It affixes cards.  It inserts at high

E. Ortiz - by Ms. DiVittore

27

1    speeds.  It has an inkjet capability in the back end

2    to spray information on the envelope.  So it's what

3    traditionally has been two or three different pieces

4    of equipment all rolled into one.

5         Q.    So when you, for example, were engaged in

6    direct mail services with Princeton Fulfillment,

7    this equipment is just newer technology that does

8    more?

9         A.    It's technology that does what three or

10   four different pieces of machine equipment would do

11   with separate people running them, all in one

12   complete unit.

13        Q.    Did Mr. Donahue build the equipment or

14   machine?

15        A.    Mr. Donahue helped design the machine.

16   It was built by a company, another company.

17        Q.    And at the time you were looking into

18   purchasing this equipment, was it in use?

19        A.    It was not in use.

20        Q.    Had it been tested, do you know; was it

21   working?

22        A.    It --

23             MR. BORDEN:  Now, would you just read

24   that question back?  I thought there were two

25   questions in there.

28

1                               * * *

2              (Whereupon, reporter read pending question.)

3                               * * *

4              MR. BORDEN:  Okay.  Go ahead.

5         A.    Wasn't working.  And both times we went

6    to visit the machine, they couldn't get it to work.

7         Q.    But you and Mr. Herman were working with

8    Mr. Donahue to proceed with acquiring this

9    equipment?

10        A.    We were working to determine whether

11   there was a viable marketplace for the technology.

12        Q.    And what was Mr. Donahue's role other

13   than designing the equipment?

14        A.    He was the resident expert on the

15   equipment since he helped design it and had a sales

16   role to play.

17        Q.    And at some point in 2016 you decided to

18   move forward?

19        A.    Correct.

20        Q.    And how -- if you can explain, what you

21   and Mr. Herman agreed, who -- or whether there were

22   others involved?

23             MR. BERARDINELLI:  Object to the form.

24   You can answer.

25             MR. BORDEN:  Do you understand the

E. Ortiz - by Ms. DiVittore

29

1    question?

2              MS. DIVITTORE:  I can rephrase it,

3    actually, because I didn't ask it well.

4        Q.    In the fall of 2016 you decided to move

5    forward and form this business to acquire the

6    machine, correct?

7        A.    Correct.

8        Q.    Who was involved with that decision?

9        A.    Myself, Pat, we consulted with Mike.

10   That was it.

11       Q.    Can you explain what the business model

12   was going to look like?

13       A.    The business model was to do a more

14   sophisticated mail piece, a match mail piece with

15   all the capabilities the machine had, at high

16   volume; not to do traditional direct mail like your

17   client performs.  This is a different type of direct

18   mail.  And that was what the business was -- was

19   supposedly to be about.

20                        * * *

21        (MO Deposition Exhibit 8 was marked for

22                  identification.)

23                        * * *

24              MS. DIVITTORE:  Show you what we've

25   marked as Exhibit 8.

E. Ortiz - by Ms. DiVittore

30

1            MR. BORDEN:  Is this for David?

2            MS. DIVITTORE:  Yes.  Apologize.

3       Q.    Mr. Ortiz, do you recognize Exhibit 8 as

4    a series of e-mail between Mr. Herman, Mr. Donahue

5    and yourself?

6       A.    I recall them.

7       Q.    And the subject line is "our business";

8    is that correct?

9       A.    That's what it says.

10      Q.    So you wrote to Mr. Herman on

11   November 25, 2016, concerning "our business," right?

12      A.    Correct.

13      Q.    And on page IFM-5 of this exhibit it

14   talks about a meeting at -- is it ANRO, A-N-R-O, and

15   date for the demo at Fry; is that right?

16      A.    Correct.

17      Q.    What is Fry?

18      A.    Fry was the owner of the machine.

19      Q.    Was Mr. Donahue an employee of Fry?

20      A.    In the past.

21      Q.    So he worked at Fry and was designing --

22      A.    He worked at Fry, he helped design the

23   machine, Fry had it built.  They couldn't run it.

24   It sat with a tarp over it.

25      Q.    And what is ANRO?

E. Ortiz - by Ms. DiVittore

31

1    A.    ANRO is a direct marketing company in
2  West Chester, Pennsylvania.
3    Q.    What does the direct marketing company
4  do?
5    A.    Exactly what your client does.
6    Q.    So there's no difference between direct
7  mail and direct marketing?
8    A.    Define -- ANRO has significantly more
9  products and services than your client, so it makes
10  them a direct marketing company while your client is
11  a direct mail company.
12    Q.    What other services or products does ANRO
13  have that differentiates it from North American?
14    A.    Too long a list to go through.
15  Seriously, too long a list.
16    Q.    Give me some examples of different --
17    A.    They have --
18    Q.    Please let me finish my question.
19         MR. BERARDINELLI:  Let her finish.
20    A.    They have wide-format printing.  They
21  have unique bindery capabilities.  They have two
22  dozen forms of digital printing capability.  They
23  have a true fulfillment business.  They have a
24  creative agency.  They have a production services
25  agency.  Is that enough examples?

32

1        Q.      What is wide format printing?

2        A.      It's like when you walk into a store and

3   you see a big banner.  That's wide format printing.

4        Q.      And what do you mean by true fulfillment?

5        A.      Real -- E-commerce, Pick Pack, shipping,

6   logistics.

7        Q.      And in this string of e-mails on

8   November 17, 2016, Michael Herman wrote to Mr.

9   Donahue, "It is time for us to come to an agreement

10  incorporating all the aspects, our company, patents

11  and operating and partnership agreement so that all

12  feel comfortable."

13              Do you see that?

14       A.      Uh-huh.

15       Q.      What is Mr. Herman's role at this point,

16  and why is he negotiating the agreement for Mr.

17  Donahue?

18              MR. BERARDINELLI:  Object to the form.

19              MR. BORDEN:  Objection; misstates the

20  contents of the document.

21       Q.      Okay.  You may answer.

22       A.      He was consulting.

23       Q.      At this point was IFM formed as a

24  corporation or an LLC?

25       A.      I don't remember the exact date IFM was

33

1    formed, but it was formed sometime late '16.

2        Q.    And am I correct that there was an issue

3    with a patent?

4        A.    There was a patent that's been issued for

5    the technology.  So I don't understand what you mean

6    there's an issue with the patent.

7        Q.    At the time you were looking to purchase

8    the machine, was there a patent for the machine?

9        A.    No.

10       Q.    When was a patent issued for the machine?

11       A.    Sometime in 2017.

12       Q.    Was that issued to IFM?

13       A.    I think the patent is in the name of Pat

14   Donahue owned by IFM.

15       Q.    Do you know the terms of Mr. Donahue's

16   employment with IFM?

17       A.    Correct, yeah, I do.

18       Q.    What were they?

19       A.    He was given a salary, he was given ten

20   percent of the company with an ability to grow to 20

21   percent if he hit a certain target in sales.  And

22   that did not occur.

23       Q.    What do you mean by "he was given ten

24   percent of the company"?

25       A.    We made him a ten-percent partner, okay,

E. Ortiz - by Ms. DiVittore

34

1    in IFM.

2         Q.    As a member of the LLC?

3         A.    No, not as a member.  The company's owned

4    by my wife.  Okay.  But he had ten percent.  So if

5    there was ever a transaction, an event with the

6    company, he would have gotten ten percent.

7         Q.    Is there any type of written agreement

8    that memorializes this?

9         A.    I believe there's an employment contract

10   with Pat.

11        Q.    Did he receive a sign-on bonus?

12        A.    I think he got an advance of 20 or

13   $25,000.

14                          * * *

15        (MO Deposition Exhibit 9 was marked for

16                    identification.)

17                          * * *

18        Q.    Show you what we have marked as

19   Exhibit 9.

20               Do you recognize this as a November 26,

21   2016, e-mail correspondence between you and Mr.

22   Herman?

23        A.    I do.

24        Q.    And this also concerns the formation of

25   IFM?

E. Ortiz - by Ms. DiVittore

35

```
 1        A.    I believe it discusses some of the
 2   capital needed for the business.
 3        Q.    And what was the capital at this point
 4   that you thought you needed for the business?
 5        A.    As I'm reading this thing, a few hundred
 6   thousand dollars.
 7        Q.    Could you tell me the breakdown?
 8              MR. BERARDINELLI:  Object to form;
 9   document speaks for itself.
10              MR. BORDEN:  Yeah.  Do you want him to
11   read it?
12              MS. DIVITTORE:  I want him to tell me
13   what funds for what specific items he believed was
14   necessary.
15        A.    He says here about a quarter million
16   dollars, maybe a hundred grand less if ANRO did some
17   of the printing, and then some legal dollars.
18   That's what it says.
19        Q.    And can you explain how this would work
20   with the machine, your new business and ANRO?
21        A.    To run the machine you need to have the
22   stuff printed digitally up front.  ANRO has digital
23   printing equipment.  So we were looking to them to
24   provide the digital printing up front so we can do
25   the rest with the machine.
```

E. Ortiz - by Ms. DiVittore

36

1    Q.    What would ANRO actually print?

2    A.    Something like this.

3    Q.    Okay.

4    A.    In many, many tens of thousands of

5 pieces.

6          MR. BERARDINELLI:  Just so record's

7 clear, Mr. Ortiz held up Exhibit 8 when he said

8 something like this.

9          MR. BORDEN:  Actually, nine.

10          MR. BERARDINELLI:  Nine.  Thank you.

11          MR. BORDEN:  Nine.

12    Q.    So they would bring you the printed

13 documents and then what would you do?

14    A.    It would be on a web roll, print the

15 documents, would be as little as, I don't know, a

16 few thousand names to a few million, and then the

17 machine would do the rest.  Fold it, match it,

18 multiple components, insert it.

19    Q.    And when it came out at the end of the

20 machine, would it be in an envelope?

21    A.    It would be in an envelope.

22    Q.    And Mr. Herman in that e-mail chain says,

23 "Sue was sent instructions to LLC it in Delaware."

24          Do you know what that references?

25    A.    I think at the time we had a discussion

E. Ortiz - by Ms. DiVittore

37

1    about making IFM a Delaware entity, and we did not

2    proceed forward with that.   And it's a New Jersey

3    entity.

4         Q.    And Sue was Mrs. Bender?

5         A.    I believe that's correct.

6         Q.    Do you know why Sue would be performing

7    -- or why Sue would receive the instructions to LLC

8    the company?

9         A.    I have no idea why.

10        Q.    Did you ever discuss that with Mr.

11   Herman?

12        A.    No idea why.

13        Q.    And it says, "Doug has the funds in place

14   for the purchase."

15             Do you see that?

16        A.    That is correct.

17        Q.    Is that Doug Holthaus?

18        A.    That is Doug Holthaus.

19        Q.    Can you explain Mr. Holthaus's role; was

20   he providing the funding for the formation of the

21   company?

22        A.    Doug Holthaus arranged for capital for

23   IFM.

24        Q.    How did he arrange for capital?

25        A.    He went to the market and got us a

E. Ortiz - by Ms. DiVittore

38

1    partner to fund the business startup of IFM.

2        Q.    And who was that partner?

3        A.    A company called Sofitel.

4        Q.    When did you become aware of Sofitel?

5        A.    Back when Doug arranged for the

6    financing.

7        Q.    And that was in this November 2016 time

8    frame?

9        A.    Sometime late '16.

10       Q.    And prior to that time you had never

11   heard of Sofitel?

12       A.    Never in my wildest dreams.

13       Q.    At the time that Mr. Holthaus was

14   securing this funding, was there any type of

15   agreement in place?

16       A.    There was discussions about the agreement

17   with Sofitel.

18       Q.    Tell me about those discussions.

19       A.    It was basically a royalty agreement.

20   Sofitel would be paid a royalty based on units

21   produced through the machine.

22       Q.    How much funding was Sofitel going to

23   provide?

24       A.    Um, there wasn't a number.

25       Q.    So you had unlimited funds available to

E. Ortiz - by Ms. DiVittore

39

1    you?

2         A.    Well, let's just say there wasn't, like,

3    a hundred thousand or ten million.   It was no set

4    number.

5         Q.    Was there any security pledged for these

6    funds?

7         A.    There was a royalty agreement.

8         Q.    Do you have a copy of the royalty

9    agreement?

10        A.    No, I don't.

11        Q.    Were you -- did you ever sign a royalty

12   agreement?

13        A.    No, because -- you'll have to ask Doug.

14        Q.    I'm asking you.

15        A.    You'll have to ask Doug.

16        Q.    Please let me finish my question.   I'm

17   asking you as the officer of IFM whether you ever

18   signed a royalty agreement with Sofitel.

19        A.    My answer is no.

20        Q.    Do you know whether your wife, as the

21   only owner of IFM, signed a royalty agreement with

22   Sofitel?

23        A.    The answer is no.

24        Q.    And you would agree with me that Attorney

25   Holthaus passed away?

40

1        A.    I believe so.

2        Q.    Do you have any e-mail correspondence

3    concerning this royalty agreement?

4        A.    With Doug Holthaus, yes.

5            MS. DIVITTORE:  I'd ask why that hasn't

6    been produced.

7            MR. BORDEN:  We will be happy to look

8    again, but we made -- I can tell you we made a

9    thorough and diligent search of all the e-mail

10   traffic from a number of different sources, and if

11   it wasn't there, it wasn't there.

12           MR. BERARDINELLI:  Also, sounds a lot

13   like an attorney-client communication to me.

14       Q.    So it's your position that Attorney

15   Holthaus represented IFM?

16       A.    Correct.  I said that at the beginning.

17       Q.    Do you have a fee agreement or a retainer

18   agreement with Mr. Holthaus?

19       A.    I don't recall.

20       Q.    Are you aware that Mr. Holthaus is

21   connected with Sofitel?

22           MR. BERARDINELLI:  Object to the form.

23       A.    Explain.

24       Q.    Are you aware whether Mr. Holthaus has

25   any type of connection to Sofitel?

E. Ortiz - by Ms. DiVittore

41

1        A.     Not aware --

2               MR. BORDEN:  Let me just caution you that

3    if the only way you know the answer to that is

4    something that Mr. Holthaus told you, then you

5    should not answer that question.  If you know it

6    independently...

7        A.     I don't know.  Simple.

8               MR. BORDEN:  Fine.

9        Q.     Did you speak with Mr. Herman about

10   Sofitel?

11       A.     Mr. Herman referred me to Mr. Holthaus.

12       Q.     Was that in the fall of 2016?

13       A.     Some point in 2016.

14       Q.     What did Mr. Herman tell you about

15   Sofitel?

16       A.     Nothing.

17       Q.     And it's your position that Attorney

18   Holthaus actually provided legal services for IFM?

19       A.     Correct.

20       Q.     But you don't know whether you have a fee

21   or a retainer agreement?

22       A.     I don't know.

23       Q.     Do you know whether you paid Attorney

24   Holthaus for legal services?

25       A.     I believe so, but I don't recall when.

E. Ortiz - by Ms. DiVittore

42

1             MS. DIVITTORE:  I would ask -- of course,
2    I'm not entitled to any privileged communication,
3    but I would ask for redacted billing to demonstrate
4    that Attorney Holthaus provided legal services.
5             MR. BORDEN:  We'll certainly take that
6    under advisement.  I'd just ask that -- so that, you
7    know, everything's clear, that you send us a
8    confirming letter after the deposition.
9             MS. DIVITTORE:  Sure.  I'm making a list
10   for what I've asked for.
11            MR. BORDEN:  And we'll respond to it
12   promptly.
13        Q.   Okay.  Were there any other companies or
14   individuals that invested or provided funding for
15   IFM?
16        A.   No.
17        Q.   Did Mr. Herman provide any funds for the
18   formation or operation of IFM?
19            MR. BERARDINELLI:  Object; compound.
20        Q.   Did Mr. Herman provide any funds to form
21   IFM?
22        A.   No.
23        Q.   Did Mr. Herman personally provide any
24   funds for IFM operations?
25        A.   Other than the $15,000 loan that he gave

E. Ortiz - by Ms. DiVittore

43

1  me that we paid back, no.  You have record of that.

2      Q.    Are you familiar with the company

3  Chiefeast, LLC?

4      A.    No.

5      Q.    Bear Air?

6      A.    No.

7      Q.    National Marketing Development

8  Corporation?

9      A.    No.

10      Q.    Bariloche, B-A-R-I-L-O-C-H-E, Adventura,

11  A-D-V-E-N-T-U-R-A?

12      A.    No.

13      Q.    3402 Holding Corporation?

14      A.    No.

15      Q.    Wye, W-Y-E, Switches?

16      A.    No.

17      Q.    Berthaphil, B-E-R-T-H-A-P-H-I-L?

18      A.    Yes.

19      Q.    What do you know about Berthaphil?

20      A.    I believe that's Mike's business in the

21  Philippines.

22      Q.    Did Berthaphil provide any funding?

23      A.    None.

24          MR. BORDEN:  Any funding for what?

25          MS. DIVITTORE:  IFM.

E. Ortiz - by Ms. DiVittore

44

1         MR. BORDEN:  Okay.

2         MR. BERARDINELLI:  Stephanie, if you're

3    at a good point, can we take a quick restroom break?

4         MS. DIVITTORE:  Sure.

5         MR. BERARDINELLI:  Not immediately if

6    you're on a flow.

7         MS. DIVITTORE:  No.  I mean, it's up to

8    you.

9         MR. BERARDINELLI:  All right.  Let's go.

10                      * * *

11        (Whereupon, a brief recess was taken.)

12                      * * *

13   MR. BORDEN:  Mr. DiVittore, I apologize for

14   interrupting, but I just want to assist.  I think

15   Mr. Ortiz, when he answered the questions about the

16   list of companies, he understood you to be asking

17   whether he had any knowledge about the substantive

18   operations of those companies, not whether he had

19   ever heard of them.  So you -- all I'm suggesting is

20   you may want to further that examination a little

21   bit.  I think he has some knowledge that he's

22   certainly prepared to testify about.

23   BY MS. DIVITTORE:

24        Q.    What, Mr. Ortiz, is your knowledge of the

25   company National Marketing Development Corporation?

45

1    A.    Frankly, nothing.  And I can just make it
2  simple for you for the list.  I've heard the names
3  because of the lawsuit, but I know nothing about the
4  companies themselves.  And that's how I interpreted
5  your question.
6    Q.    You've been friends with Mr. Herman for
7  quite some time.
8    A.    Correct.
9    Q.    You're not aware of Bear Air or Chiefeast
10  companies affiliated with his airplane?
11    A.    I've heard the names because of the
12  lawsuit.  I know no details about any of the
13  entities.  It's not my business.
14    Q.    I don't want you to tell me anything that
15  might be privileged, but did you, personally, speak
16  with Doug Holthaus in the fall of 2016 about forming
17  this business?
18    A.    Which business?
19    Q.    IFM.
20    MR. BORDEN:  So if it was a conversation
21  solely between you and Holthaus about a matter
22  relating to his legal representation to you --
23    MS. DIVITTORE:  I'm going to object to
24  that.
25    MR. BORDEN:  -- you shouldn't testify to

E. Ortiz - by Ms. DiVittore

46

1    it.

2          MS. DIVITTORE:  My question was excluding

3    any privileged information, did you, personally,

4    speak with Mr. Holthaus during the fall of 2016.

5          MR. BORDEN:  Okay.  Not everybody in this

6    room or in the world knows the exact parameters of

7    the attorney-client relationship.

8          THE WITNESS:  What is it with this chair?

9          MR. BERARDINELLI:  You hit it with your

10   calf.

11         THE WITNESS:  I mean, I know I weigh a

12   little bit...

13                    * * *

14   (Whereupon, an off-the-record discussion was held.)

15                    * * *

16         MR. BORDEN:  Okay.  So what I was saying

17   is --

18         MS. DIVITTORE:  It's a yes or no

19   question, Attorney Borden.  Don't tell me what was

20   said, tell me whether you, personally, spoke with

21   Attorney Holthaus in the fall of 2016.

22         MR. BORDEN:  Did he speak with him; is

23   that the only question?  Okay.  You can answer that.

24   A.    Yes.

25   BY MS. DIVITTORE:

E. Ortiz - by Ms. DiVittore

47

1      Q.    Did Mr. Herman participate in those

2  conversations?

3      A.    No.

4      Q.    Approximately how many times did you

5  speak with Mr. Holthaus?

6      A.    Can't recall.

7      Q.    One to two, 10 to 20.  Give me an

8  estimate.

9      A.    Can't recall.

10     Q.    Was it always by telephone?

11     A.    Always by telephone.

12     Q.    Did you meet with Attorney Holthaus?

13     A.    Yes.  I can't recall the date.

14     Q.    Do you know where you met him?

15     A.    San Diego.

16     Q.    And that was where his office was based?

17     A.    Correct.

18     Q.    Did you meet at his office?

19     A.    At his house office.

20     Q.    Was there anyone else present?

21     A.    His paralegal.

22     Q.    What about Mr. Herman?

23     A.    Mr. Herman was in San Diego.  I don't

24  remember him being at the meeting.

25     Q.    Do you know when that meeting occurred?

E. Ortiz - by Ms. DiVittore

48

1        A.    Late in '16, if I recall correctly.

2        Q.    And that was, again without telling me

3    what you discussed, but it was for the purpose of

4    talking about IFM?

5        A.    Correct.

6                        * * *

7        (MO Deposition Exhibit 10 was marked for

8                    identification.)

9                        * * *

10       Q.    Show you what we've marked as Exhibit 10.

11   Do you agree that this is a December 4th e-mail

12   exchange between you and Mr. Herman concerning IFM?

13       A.    Correct.

14       Q.    Mr. Herman is telling you, and I quote,

15   "Stay on Doug's ass and keep expressing our need to

16   be able to negotiate with ANRO."

17              Do you see that?

18       A.    Correct, I see it.

19       Q.    Can you tell me what that means?

20       A.    If you recall my prior testimony about

21   ANRO doing the printing for us, that's what it

22   refers to.

23       Q.    What do you mean by -- what does he mean

24   by "Stay on Doug's ass"?

25       A.    To get the paperwork done.

E. Ortiz - by Ms. DiVittore

49

1      Q.     With whom?

2      A.     The whom, that I can't answer.

3      Q.     So you don't know what you were supposed

4   to be contacting Attorney Holthaus about?

5      A.     I believe it had to do with the paperwork

6   concerning IFM; but who, I don't recall who Doug was

7   doing it with.

8      Q.     Did IFM enter into any type of agreement

9   with ANRO?

10     A.     No.  Never got there.

11     Q.     You indicated that the goal was to enter

12  into an agreement with ANRO to provide the actual

13  digital print.

14     A.     Uh-huh.

15     Q.     Yes?

16     A.     Correct.  Yes.

17     Q.     And then your company would use the

18  technology to complete it?

19     A.     Correct.

20     Q.     What happened with ANRO that you didn't

21  negotiate an agreement?

22     A.     ANRO could not finalize any kind of

23  agreement with us.  They just couldn't get it done.

24     Q.     Did you need them to be able to operate?

25     A.     We needed a printing source.

E. Ortiz - by Ms. DiVittore

50

1      Q.    And IFM was formed and purchased the

2   equipment, correct?

3      A.    Correct.

4      Q.    Did IFM have a bank account?

5      A.    It does.  Or it did.

6      Q.    With which bank?

7            MR. BORDEN:  Just to be clear, when are

8   we talking about here?  What time frame?

9            MS. DIVITTORE:  Ever.

10     Q.    Did IFM ever have a bank account?

11           MR. BORDEN:  Okay.

12     A.    Yes, it does.

13     Q.    Did it have one or more accounts?

14     A.    One.

15     Q.    And was that account with Bank of

16  America?

17     A.    It is -- or was.

18                      * * *

19       (MO Deposition Exhibit 11 was marked for

20                identification.)

21                      * * *

22           THE WITNESS:  Ed, can I ask a question?

23           MR. BORDEN:  Let's see what she asks.

24  See what her question is.

25     Q.    Mr. Ortiz, I'll represent to you that

E. Ortiz - by Ms. DiVittore

54

1      Q.      In order for the machine to be
2   successful, did you need other equipment?
3      A.      We needed an inkjet.
4      Q.      Can you describe for those of us not in
5   the business what an inkjet is?
6      A.      Does the printing; mostly for a name and
7   address on an envelope.
8      Q.      Did it also print the digital?
9      A.      No.
10     Q.      Did you purchase -- did IFM purchase an
11  inkjet?
12     A.      No, we rented one for a period of time.
13     Q.      What was the direct fulfillment portion
14  of IFM?
15     A.      Putting stuff in a box, shipping it out
16  for customers.
17     Q.      Were there offices in the building?
18     A.      There were offices in the building.
19     Q.      Did IFM purchase office furniture,
20  computers, things of that nature?
21     A.      It did.
22     Q.      And who had offices at IFM space in
23  Lumberton, New Jersey?
24     A.      Myself and Stephanie.
25     Q.      And that's Stephanie Ortiz, your

E. Ortiz - by Ms. DiVittore

55

1     daughter-in-law?

2          A.     Correct.

3          Q.     How about Mr. Herman?

4          A.     Had no office.

5          Q.     Did he visit the facility?

6          A.     Once or twice.

7          Q.     Back to Exhibit 11.  Page 66 indicates

8     that on May 3rd and May 26th Sofitel wired IFM

9     $50,000 both.

10         A.     Okay.

11         Q.     Is that correct to your recollection?

12         A.     Correct.

13         Q.     Page 60 indicates a $50,000 wire to IFM

14    on June 27th.  Do you believe that's correct?

15         A.     I'm sure it is.

16         Q.     Page 56, $35,000 wire to IFM on July 18th

17    of 2017?

18                MR. BERARDINELLI:  56?  I'm sorry, I

19    missed the page.

20                MS. DIVITTORE:  Yes.

21         A.     Correct.

22         Q.     And on page 54, a $40,000 wire to IFM on

23    August 28th?

24         A.     Correct.

25         Q.     Page 48, September 2017, there was a

E. Ortiz - by Ms. DiVittore

57

1   the source of the funds?

2        Q.     Do you know where Sofitel Investments,

3   Inc. was getting the money to wire to IFM?

4        A.     Have no idea.

5        Q.     Are you familiar with a person named

6   Tracy Forrest, F-O-R-R-E-S-T?

7        A.     No.

8        Q.     Are you familiar with the Hoover Legacy

9   Foundation?

10        A.     I've heard Mike talk about it.

11        Q.     Do you know what it is?

12        A.     No, I don't know specifically what it is.

13        Q.     Did IF Mail provide any funds to the

14   Hoover Legacy Foundation?

15        A.     Directly?

16        Q.     Yes.

17        A.     Not that I know of.

18        Q.     Did you have any discussions with Sue

19   Bender, to your knowledge, about the Hoover Legacy

20   Foundation?

21        A.     If you're referring to the $25,000

22   reimbursement from Mike's expenses, that I think

23   Mike sent it off to the foundation, that's about the

24   only thing I know.  And I think -- if I recall

25   correctly, I think that's what he instructed Sue to

E. Ortiz - by Ms. DiVittore

58

1   do with the money that we paid him for the use of

2   the airplane.

3        Q.    So it's your contention that IFM at some

4   point paid Mr. Herman for using the airplane that

5   Mr. Herman flies?

6        A.    IFM reimbursed Mike $25,000 for the trips

7   that he took to go look at the machine while we made

8   a decision to purchase it.

9                        * * *

10       (MO Deposition Exhibit 12 was marked for

11                    identification.)

12                       * * *

13            MS. DIVITTORE:  Shoot, can I retract that

14   a minute?

15            We are on the record.  David, the

16   majority of the production from Michael Herman was

17   marked attorneys' eyes only, but I was able to

18   largely use IFM documents that were not.

19            MR. BERARDINELLI:  Sure.

20            MS. DIVITTORE:  I just realized the next

21   exhibit that was --

22            MR. BERARDINELLI:  Let me see it then.

23   I'm probably not going to have a strong preference.

24   The protective order lets them be here.

25            MS. DIVITTORE:  I handed it to Mr. Ortiz

E. Ortiz - by Ms. DiVittore

59

1    without realizing it.

2              MR. BERARDINELLI:  Yeah, this is fine.

3              MS. DIVITTORE:  Actually, this one says

4    confidential.

5              MR. BERARDINELLI:  That's why it's fine.

6              MS. DIVITTORE:  Thank you.

7              Sorry about that.

8              MR. BERARDINELLI:  That's 11?

9              MS. DIVITTORE:  It's 12.

10        Q.    Mr. Ortiz, I'll represent to you that

11   this was a document produced by Mr. Herman in the

12   discovery in this case.  It's an e-mail from Michael

13   Herman to Susan Bender at NAC but it's talking about

14   you.  It's dated January 5, 2017.  Subject:  Manny.

15   "He's going to call you to discuss documentation

16   needed for IF Mail for my expenses thus far."

17              Is that correct?

18        A.    Correct.

19        Q.    The second paragraph said, "He is also

20   sending you a check for $25,000 for the above."

21        A.    Uh-huh.  Correct.

22        Q.    And do you know why the expenses that Mr.

23   Herman incurred would be -- the money would be

24   forwarded to the Hoover Foundation?

25        A.    I have no idea.

E. Ortiz - by Ms. DiVittore

60

1    Q.    You had no discussions with him about

2    that?

3    A.    All I agreed to do was reimburse him for

4    the expenses.  What he did with his money is his

5    business.

6    Q.    So as IFM is operating beginning in late

7    2016 into 2017, when IFM needed money for its

8    expenses, what was the process?

9    A.    I'd call Doug or e-mail Doug.

10   Q.    Isn't it true that most of the time that

11   you were requesting funds you would e-mail Mr.

12   Herman?

13   A.    I'd let Mike know we were doing that

14   because Doug also represented Mike.  So as far as I

15   was concerned, it was a courtesy to keep him

16   informed.

17   Q.    So it's your position you would e-mail

18   Attorney Holthaus directly requesting funding?

19   A.    Correct.

20   MS. DIVITTORE:  Again, counsel, I would

21   ask for a redacted e-mail to demonstrate that those

22   correspondence occurred because I don't believe any

23   were produced.

24   MR. BORDEN:  Okay.  We'll certainly

25   consider that.

E. Ortiz - by Ms. DiVittore

61

1      Q.    At some point in 2017 you requested money

2    from Mr. Herman; is that right?

3      A.    Are you referring to the $15,000 loan?

4      Q.    I'm asking you.

5      A.    That's the only one that I can think of.

6      Q.    Tell me about this $15,000 loan.

7      A.    I didn't have time to get a hold of Doug

8    and I needed to make payroll and Mike advanced us 15

9    grand, and I believe we reimbursed him.

10          MS. DIVITTORE:  Show you what was marked

11   as Exhibit 13.  And again, David, this is a

12   confidential from your production.  Is that right?

13          MR. BERARDINELLI:  Okay.  Confidential is

14   fair play.  They're allowed to see it, just not

15   disclose it to third parties.

16     Q.    Show you what we've marked as Exhibit 13,

17   and represent that it's a document produced by Mr.

18   Herman again in discovery in this case.

19                       * * *

20      (MO Deposition Exhibit 13 was marked for

21                  identification.)

22                       * * *

23     Q.    Do you recognize that as a May 1, 2017,

24   e-mail from Mr. Herman to Susan Bender, subject IFM?

25     A.    I do.

E. Ortiz - by Ms. DiVittore

62

1      Q.    It says, "Mike, I will take you up on

2   your offer to have Sue wire us some cash.  Can you

3   have her send $15,000 to cover printer and payroll."

4      A.    Correct.

5      Q.    And this is the loan to which you were

6   referring?

7      A.    Correct.

8      Q.    Are there any written loan documents?

9      A.    None.

10      Q.    And do you know where the money came

11   from?

12      A.    No.  Sue wired us the $15,000.

13      Q.    Why is Sue involved at this point?

14      A.    Because Mike got her involved.

15      Q.    And so you don't know whether this money

16   came from Mr. Herman, personally, or Chiefeast, LLC?

17      A.    I really don't.

18                    * * *

19      (MO Deposition Exhibit 14 was marked for

20                  identification.)

21                    * * *

22      Q.    Show you what we've marked as Exhibit 14

23   and, again, represent that this was a document

24   produced by North American this time in discovery in

25   this case.

E. Ortiz - by Ms. DiVittore

63

1        A.      (Witness reviewing.)

2        Q.      Do you recognize this as wiring

3    instructions for a wire to the IF Mail account at

4    Bank of America?

5        A.      That's what it appears.

6        Q.      And would this be consistent with the

7    loan of $15,000?

8        A.      I would believe so.

9        Q.      And the funds came from Chiefeast, LLC?

10       A.      Okay.

11       Q.      Is that correct?

12       A.      That's what it says.  I mean, I -- I just

13   got the money.  I have no intent, no plans, no

14   knowledge about where Mike was sending us the money

15   from.  This paperwork indicates Chiefeast, then I

16   assume it's correct.

17       Q.      As the managing partner of IFM, were you

18   the one responsible for tracking the funds?

19       A.      No.

20       Q.      Who was?

21       A.      My daughter-in-law let me know the money

22   was in the account.

23       Q.      But you were the one that would request

24   the money?

25       A.      I requested the funds but I wasn't

E. Ortiz - by Ms. DiVittore

64

1    tracking the Bank of America account to know the

2    moment that any funds arrived.

3         Q.    Requests for money came from you, though.

4         A.    Requests for money came from me.

5         Q.    So you would have made the request for

6    the loan to Michael Herman.

7         A.    The e-mail clearly indicates I asked Mike

8    for the 15 grand.

9         Q.    But you weren't aware that it came from

10   Chiefeast?

11        A.    Not at all.

12              MR. BERARDINELLI:  Manny, let her finish

13   her question before you start to answer.

14              THE WITNESS:  I think I've answered it

15   four times already, David.

16              MR. BERARDINELLI:  But just -- I'm only

17   asking for the benefit of the court reporter.

18   You're starting to talk over her a little bit and

19   that's difficult for the court reporter to do her

20   job.

21        Q.    Did IFM repay Mr. Herman and/or

22   Chiefeast, LLC?

23        A.    I believe so.

24        Q.    When was the repayment?

25        A.    I don't recall when.

E. Ortiz - by Ms. DiVittore

65

1      Q.    How would it have been repaid?

2      A.    I believe we would have given Mike the 15

3   grand.

4      Q.    Via wire or check?

5      A.    Probably wire.

6      Q.    IFM would have record of that?

7      A.    I would hope so.

8            MS. DIVITTORE:  Again, I'd make a

9   request -- I'll include in my written -- for any

10  documentation concerning repayment of the $15,000

11  loan.

12                    * * *

13       (MO Deposition Exhibit 15 was marked for

14                identification.)

15                    * * *

16           MR. BERARDINELLI:  Give us a second,

17  Stephanie.

18           MS. DIVITTORE:  Sure.

19           MR. BERARDINELLI:  Thank you.

20     Q.    Mr. Ortiz, I'll show you what we've

21  marked as Exhibit 15.  Do you recognize this as a

22  June 16th --

23           MR. BERARDINELLI:  Stephanie, after this

24  document can we take a restroom break?

25           MS. DIVITTORE:  Sure.

E. Ortiz - by Ms. DiVittore

66

1              Can I start my question over because I
2    have the date wrong.
3         Q.    Do you recognize this as a May 24, 2017,
4    e-mail from you to Mr. Herman copying Stephanie
5    Ortiz?
6         A.    I do.
7         Q.    And can you explain?
8         A.    This is --
9              MR. BORDEN:  Wait.  Explain what?
10        Q.    Can you explain this e-mail and the
11   purpose of it?
12        A.    I believe this is like any other e-mail
13   that I copied Mike on, letting him know that we were
14   going to look for funds.
15        Q.    And you're looking for $50,000?
16        A.    Yeah.  I'm sure that this 50,000 probably
17   coincides with one of those dates that you read off
18   to me that came from Doug Holthaus arranging the
19   funding through Sofitel.
20        Q.    But this is a request from you to Mr.
21   Herman --
22        A.    It's -- it's just an e-mail that I wrote.
23        Q.    Please let me finish my question.
24        A.    Knock yourself out.
25        Q.    This is a request from you to Mr. Herman

E. Ortiz - by Ms. DiVittore

67

1    that specifically says you should send $50,000.

2         A.    That's your interpretation.

3         Q.    Mr. Ortiz, my question is this is a

4    request from you directly to Mr. Herman that says,

5    "You should send $50,000."

6              Correct?

7              MR. BERARDINELLI:  Objection; the

8    document speaks for itself.

9         A.    He just objected.

10             MR. BERARDINELLI:  You can answer.

11             MR. BORDEN:  You should go ahead and

12   answer.  She's just asking if that's what the -- if

13   that's how the e-mail reads.

14        A.    My interpretation is me keeping Mike

15   informed of what we were doing.  That's all I have

16   to answer on that.

17        Q.    My question, Mr. Ortiz, if you could

18   please read it back, is a yes or no question.

19                       * * *

20        (Whereupon, reporter read pending question.)

21                       * * *

22             MR. BERARDINELLI:  Same objection.

23        A.    Asked and answered.

24             MS. DIVITTORE:  Counsel, I'd ask that

25   your client be directed to answer the yes or no

E. Ortiz - by Ms. DiVittore

68

1   question.

2           MR. BORDEN:  Okay.  The only question is,

3   is that how it reads?

4           THE WITNESS:  It's a matter of

5   interpretation, Ed.

6           MR. BORDEN:  All right.  That's his

7   answer.  It's a matter of interpretation.

8           MS. DIVITTORE:  That is not an acceptable

9   answer.

10      Q.    My question is:  Does this -- I'll again

11  ask, yes or no, is that what this document states?

12          MR. BERARDINELLI:  Same objection.

13      A.    Same answer.

14          MR. BORDEN:  And he's answered that.  You

15  may not like the answer but...

16          MS. DIVITTORE:  Because it's not an

17  answer.

18          MR. BERARDINELLI:  Can we take a restroom

19  break for Mr. Herman, please.

20          MS. DIVITTORE:  Sure.

21                    *  *  *

22      (Whereupon, a brief recess was taken.)

23                    *  *  *

24      (MO Deposition Exhibit 16 was marked for

25               identification.)

E. Ortiz - by Ms. DiVittore

69

1                          * * *

2    BY MS. DIVITTORE:

3        Q.    Mr. Ortiz, the last document I asked

4    about was funding information from May of 2017.  I'd

5    like to jump back to February of 2017.  I'll show

6    you an exhibit we've marked as MO16.

7              MR. BERARDINELLI:  Give me a minute,

8    Stephanie.

9              MS. DIVITTORE:  Sure.

10             THE WITNESS:  (Witness reviewing.)

11             MS. DIVITTORE:  And just for the record,

12   I'll note that this was a document in IFM's

13   production, but the note on the bottom right-hand

14   corner, my client was reviewing the documents and I

15   didn't have a chance to remove it.

16             MR. BERARDINELLI:  Okay.

17       Q.    Mr. Ortiz, do you recognize this as a

18   February 13, 2017, e-mail from you to Mr. Herman

19   forwarding a January 3, 2017, e-mail from you to Mr.

20   Herman and Attorney Holthaus?

21       A.    Correct.

22       Q.    And you are providing Mr. Herman and

23   Attorney Holthaus bank account information for IFM?

24       A.    Correct.

25       Q.    And the routing numbers that have been

E. Ortiz - by Ms. DiVittore

70

1    redacted for a domestic account; is that right?

2        A.    Correct.

3        Q.    It also includes an international swift

4    code for foreign wires in U.S. funds.  Do you see

5    that?

6        A.    I do.

7        Q.    Do you know what that is?

8              MR. BORDEN:  Objection.  What or just

9    what -- what is -- what a swift code is?

10             MS. DIVITTORE:  I'd ask counsel refrain

11   from speaking objections, but if you object to the

12   form, my question is, you wrote to Mr. Herman and

13   Attorney Holthaus "international swift code for

14   foreign wires in U.S. funds."

15       Q.    Do you know what an international swift

16   code for foreign wires in U.S. funds is?

17       A.    No.

18       Q.    But you provided it to Attorney Holthaus

19   and Mr. Herman?

20       A.    Yes.

21       Q.    Do you know whether any foreign wires

22   were ever issued to IFM?

23       A.    My assumption is that the Sofitel monies,

24   okay, could have been a source of the international

25   funds.

E. Ortiz - by Ms. DiVittore

71

1     Q.    Do you know whether there were funds

2   issued from a Sofitel account other than the U.S.

3   Bank account you testified to earlier?

4     A.    None.  That's -- like I said, it's an

5   assumption on my part.

6     Q.    Do you know whether you specifically

7   required or requested, excuse me, the international

8   swift code for foreign wires?

9     A.    No.  I believe that's probably a response

10   to something that Doug had probably asked us to

11   include.

12     Q.    Okay.

13                        * * *

14      (MO Deposition Exhibit 17 was marked for

15                   identification.)

16                        * * *

17     Q.    Now -- show you what we've marked as

18   Exhibit 17.

19           MS. DIVITTORE:  David, are we okay to go?

20           MR. BERARDINELLI:  Yeah.  Thank you.

21     Q.    Do you recognize Exhibit 17 as an e-mail

22   from you to Mike Herman concerning the financial

23   situation of IFM?

24     A.    I do.

25     Q.    And it's dated June 23, 2017?

E. Ortiz - by Ms. DiVittore

72

1      A.    Correct.

2      Q.    And it says we're around 40,000 short,

3  thus we need about $50,000 to be safe; is that

4  correct?

5      A.    Correct.

6      Q.    And again, this was to Mr. Herman, not

7  Attorney Holthaus?

8      A.    Correct.

9      Q.    Are you familiar with a company Capital

10  Mailing Equipment?

11      A.    I am.

12      Q.    Can you tell us what Capital Mailing

13  Equipment is?

14      A.    I believe they're a supplier of mailing

15  equipment.

16      Q.    Mailing equipment like your machine?

17      A.    No.  Different machines.  Not like our

18  machine.

19      Q.    Anything like the inkjet you described?

20      A.    Could be.  They could sell inkjets, I

21  believe.

22      Q.    Did you purchase anything from Capital

23  Equipment when you were operating IFM?

24      A.    We might have.  We purchased stuff.

25      Q.    Show you what we've marked as Ortiz

E. Ortiz - by Ms. DiVittore

73

1    Exhibit 18.

2                           * * *

3        (MO Deposition Exhibit 18 was marked for

4                      identification.)

5                           * * *

6    Q.    Do you recognize --

7          MS. DIVITTORE:  David, are we all right?

8          MR. BERARDINELLI:  Yeah, give me one

9    second.  Sorry.

10             Thank you.

11   Q.    Mr. Ortiz, do you recognize this as a

12   September 1, 2017, e-mail chain between you and Mr.

13   Herman?

14   A.    Yes.

15         MR. BERARDINELLI:  Object to the form.

16   Q.    Mr. Herman is telling you that he will be

17   sending you wire instructions to send $50,000 to

18   Capital Mailing Equipment early next week.

19         MR. BERARDINELLI:  Object to the form.

20         MR. BORDEN:  Objection.

21         MR. BERARDINELLI:  Do you want me to put

22   it on?  I don't want to be accused of coaching him.

23   Because of the redaction, to me it looks like the

24   e-mail from Mike -- his header is typically that

25   Michael Herman with his phone number.  So the bottom

E. Ortiz - by Ms. DiVittore

74

1  part, I don't know who that -- wrote that e-mail

2  given the redaction, which we probably could cure

3  the redaction and solve that.

4          MS. DIVITTORE:  Well, I guess I'll ask a

5  few questions.  And if that doesn't cure it, I'll

6  ask for --

7          MR. BERARDINELLI:  Sure.

8      Q.    Mr. Ortiz, would you have been telling

9  Mr. Herman that you'll send him wire instructions to

10  send $50,000 to Capital Mailing Equipment?

11     A.    It reads as such.

12     Q.    Do you recall that?

13     A.    I don't recall every e-mail.  Okay.  And

14  I don't even recall that we bought anything from

15  Capital Mailing.

16     Q.    Did IFM, other than Stephanie Ortiz, have

17  a bookkeeper or accounting person?

18     A.    Nope.  No.

19     Q.    Did IFM hire a third-party accountant?

20     A.    No.

21     Q.    Did IFM file tax returns for 2017?

22     A.    Not yet.

23     Q.    Did you receive funds from Sofitel that

24  were used for purposes other than IFM operations?

25     A.    None.  All for IFM operations.

E. Ortiz - by Ms. DiVittore

75

1    Q.    Show you what we've marked as Exhibit 19.

2                        * * *

3        (MO Deposition Exhibit 19 was marked for

4                     identification.)

5                        * * *

6    A.    (Witness reviewing.)

7          MS. DIVITTORE:  Okay.

8          MR. BERARDINELLI:  Yeah, thank you.

9    Q.    Mr. Ortiz, do you recognize this as an

10   e-mail from you to Mr. Herman forwarding an e-mail

11   from Stephanie Ortiz to you?

12   A.    Correct.

13   Q.    Dated -- your e-mail is dated

14   September 12, 2017.  Miss Ortiz' e-mail is dated

15   September 11, 2017; is that right?

16   A.    Correct.

17   Q.    And Miss Ortiz is providing you

18   information concerning the current financial

19   situation at IFM.

20   A.    Correct.

21   Q.    And you then forward that and tell Mr.

22   Herman that you're going to ask Doug to wire

23   $30,000?

24   A.    Correct.

25   Q.    And it says "unbound money will be in

E. Ortiz - by Ms. DiVittore

76

1    bank by Friday"?

2         A.    Correct.

3         Q.    What is unbound money?

4         A.    A customer.  It was a customer.  IFM no

5    longer there, and that was an AR payment.

6         Q.    Your e-mail says this will cover payroll

7    through the end of the month.

8         A.    Uh-huh.

9         Q.    And then it says, "I would like to take"

10   10,000 -- excuse me -- "10K to cover stuff at

11   house."

12        A.    Correct.

13        Q.    And that's $10,000?

14        A.    Correct.

15        Q.    What did you mean by "to cover stuff at

16   house"?

17        A.    Because I didn't take a salary from IFM,

18   so occasionally I got -- I got paid money.

19        Q.    How would the money be paid to you?

20        A.    A check.  Wire.

21        Q.    Would the money come from Sofitel

22   directly to you?

23        A.    No.  Came from an IFM account, Bank of

24   America.

25        Q.    So Sofitel would provide the funds to

E. Ortiz - by Ms. DiVittore

77

1    IFM?

2         A.    Uh-huh.

3         Q.    Yes?

4         A.    Correct.  Yes.

5         Q.    And then IFM would issue you either a

6    wire or check personally?

7         A.    Correct.

8         Q.    And Mr. Herman was aware that you would

9    take those funds for personal use?

10             MR. BERARDINELLI:  Object to the form.

11             THE WITNESS:  Excuse me?

12             MR. BERARDINELLI:  I objected to the

13   form, but you can answer.

14        A.    I'm assuming so.

15        Q.    Do you know how many times IFM issued

16   money to you?

17        A.    Probably in the course of '17, 30, 40

18   grand.

19        Q.    Was it wired or via check?

20        A.    Either way.  I don't recall.

21        Q.    I'm done with funding and would like to

22   talk about IFM operations.  Back in the fall of 2016

23   when you're talking about forming IFM, you were

24   going to purchase the machine and then use the

25   machine in the direct mail business?

E. Ortiz - by Ms. DiVittore

78

1      A.    Correct.

2      Q.    And Mr. Herman was aware that that was

3  the plan?

4      A.    Correct.

5      Q.    And there was a contract with Fry

6  concerning the purchase --

7      A.    It was a purchase agreement.

8      Q.    And that was --

9           MR. BORDEN:  I'm sorry, I think you

10  talked over each other a little bit there.  So there

11  was a contract with Fry, a purchase agreement?

12      A.    A purchase agreement.

13      Q.    And you were able to negotiate that; is

14  that right?

15      A.    Correct.

16                        * * *

17      (MO Deposition Exhibit 20 was marked for

18                    identification.)

19                        * * *

20      Q.    Show you what we've marked as Exhibit 20.

21  Do you recognize this as an e-mail from you to Mr.

22  Herman dated December 17, 2016?

23      A.    I do.

24      Q.    You're telling him, "There is lots of

25  problems with the agreement as written"; do you see

E. Ortiz - by Ms. DiVittore

79

1   that?

2        A.    I do.

3        Q.    Is that the agreement or the purchase

4   order with Fry?

5        A.    No.

6        Q.    What is this agreement?

7        A.    Pat's employment agreement.

8        Q.    Mr. Donahue?

9        A.    Mr. Donahue.

10       Q.    Okay.  Can you tell me who drafted the

11  agreement?

12       A.    Doug did.

13       Q.    On behalf of IFM?

14       A.    On behalf of IFM.

15       Q.    What was wrong with the agreement as

16  drafted?

17       A.    I don't recall the specifics of it at

18  this point.

19       Q.    Was it ultimately revised and executed?

20       A.    It was.

21       Q.    What is SITMA, S-I-T-M-A?

22       A.    The manufacturer of the machine.

23       Q.    Did the machine come with any warranties?

24       A.    None.

25       Q.    At the time you were forming IFM in the

E. Ortiz - by Ms. DiVittore

80

1    fall, early January -- fall of 2016, early January
2    of 2017, were you talking to potential customers?
3        A.    Give me those dates again, please.
4        Q.    The end of 2016, beginning of 2017, when
5    you were forming the business.
6        A.    I need further clarity on what you mean.
7    Are you referring to customers for the machine or
8    customers for IFM?
9        Q.    Either.
10       A.    Okay.  There were customers for IFM that
11   we had conversations with about fulfillment
12   business.  I don't recall any customers for the
13   machine because we didn't even have the machine up
14   and running.
15       Q.    Without telling me names, how did you
16   identify potential customers for fulfillment?
17           MR. BERARDINELLI:  I'm sorry.  You keep
18   trailing off.  I didn't get the question.
19       Q.    Excluding the name, how did you go about
20   identifying customers for fulfillment?
21           MR. BERARDINELLI:  Thank you.
22       A.    Through leads.  Making phone calls.
23       Q.    Did you have contacts in that business at
24   that point?
25       A.    Yes.

E. Ortiz - by Ms. DiVittore

81

1      Q.     Did Mr. Herman assist with contacts in

2   fulfillment?

3      A.     None.

4      Q.     What about Mr. Donahue?

5      A.     One customer.

6      Q.     And what was your plan to identify

7   potential customers for mailing?

8      A.     We needed to get the machine to work

9   first before we would talk to any customers.

10     Q.     So you never discussed the plan to

11  identify potential mailing customers?

12     A.     We discussed being able to sell mailing

13  customers, but we were never ready to sell mailing

14  customers because we couldn't get the machine to

15  consistently work.  That was January, April, July,

16  all the way straight through, till we actually took

17  it out of service because we could not get enough

18  support from SITMA, which is an Italian company, to

19  get the machine running consistently.

20     Q.     But even before it was running you had

21  discussions with Mr. Herman about how you were going

22  to go about targeting customers for the mail

23  business, correct?

24     A.     We had discussions about how we would

25  solicit business, and every discussion revolved

82

1    around my decision that we would not sell anything

2    until we had the capability of delivering a package

3    so we wouldn't fail with the customer.

4         Q.    Did Mr. Herman agree to provide you with

5    his contacts in the direct mail business?

6         A.    Mike had no contacts in the direct mail

7    business that were relevant, because Mike had been

8    retired 20-some years and there was no one that he

9    knew in today's world that would be relevant to

10   call; after being retired 20-some years.

11        Q.    Isn't it true that the retirement

12   agreement and Mr. Herman's separation from North

13   American only occurred in 2013?

14        A.    From my perspective, Mike has been

15   retired 20-some years, because he left active

16   participation at NAC many years before 2013.

17        Q.    What do you mean by "he left active

18   participation in NAC many years before 2013"?

19        A.    I think that speaks for itself.  He

20   wasn't an active owner, participant, operator.

21        Q.    And how do you know that?

22        A.    Because I've known Mike for -- since

23   1994.  And more importantly, his son and I have been

24   very close friends for many, many years.  So his son

25   has made it clear to me that Mike had left way

E. Ortiz - by Ms. DiVittore

83

1    before 2013.

2        Q.    So it's your understanding that for

3    several years, at least prior to the 2013 retirement

4    agreement, Mr. Herman was not involved in the

5    day-to-day operations of NAC?

6        A.    That's correct.  That's my understanding.

7        Q.    Do you know what involvement or function

8    he would have provided to NAC during that time

9    frame?

10       A.    I don't know.

11       Q.    I'll show you what we've marked as

12   Exhibit 21 and give you a minute to go through

13   there.

14       A.    (Witness reviewing.)

15             MS. DIVITTORE:  Can we go off to the

16   record for a minute?

17                       *  *  *

18         (Whereupon, a brief recess was taken.)

19                       *  *  *

20             MS. DIVITTORE:  Counsel, what I handed

21   you that was marked as Exhibit 21 was the incorrect

22   document.

23             MR. BERARDINELLI:  You're withdrawing

24   that one?

25             MS. DIVITTORE:  We're withdrawing that

E. Ortiz - by Ms. DiVittore

84

1    one.

2                 MR. BORDEN:  Want it back?

3                 MS. DIVITTORE:  No, you may have it.  I

4    have enough paper.  But we've remarked a

5    December 17, 2016, e-mail as <u>Exhibit 21</u>.

6                         *  *  *

7         (MO Deposition <u>Exhibit 21</u> was remarked for

8                      identification.)

9                         *  *  *

10        A.    (Witness reviewing.)

11   BY MS. DIVITTORE:

12        Q.    Mr. Ortiz, do you recognize that as a

13   December 17, 2016, e-mail exchange between you and

14   Mr. Herman copying Mr. Donahue?

15        A.    Yes.

16        Q.    And you're talking about the IFM machine;

17   is that right?

18        A.    Correct.

19        Q.    And the below e-mail from Michael Herman

20   says, you're planning on running around the clock

21   with your expected orders less maintenance time; is

22   that correct?

23        A.    Correct.

24        Q.    So your goal was to get this machine up

25   and running and work constantly except for

E. Ortiz - by Ms. DiVittore

85

1    maintenance periods?

2        A.    Correct.

3        Q.    You told me that SITMA manufactured the

4    machine?

5        A.    Uh-huh.  Yes.

6        Q.    But you bought it from Fry?

7        A.    Correct.

8        Q.    Was there any agreement with SITMA?  How

9    did that work?

10       A.    There wasn't any.  That's what we were

11   trying to negotiate.

12                        * * *

13       (MO Deposition Exhibit 22 was marked for

14                  identification.)

15                        * * *

16       Q.    I'm going to show you what we've marked

17   as Exhibit 22.

18       A.    (Witness reviewing.)

19       Q.    The top portion of the first page is a

20   December 18, 2016, e-mail from you to Patrick

21   Donahue copying Mr. Herman; is that right?

22       A.    Correct.

23       Q.    And it appears that there are

24   attachments, although they weren't attached in the

25   IFM production.  It talks about a sales

E. Ortiz - by Ms. DiVittore

86

1    representative agreement, an operating agreement for

2    IFM, SITMA insert or sale with redline changes,

3    detached bill of sale.  Do you see that?

4         A.    Correct.  Yeah, I see it.

5         Q.    With the sales representative agreement;

6    is that for Patrick Donahue?

7         A.    Yes.

8         Q.    What's the IFM operating agreement?

9         A.    What a traditional operating agreement

10   is.

11        Q.    So IFM actually had an operating

12   agreement?

13        A.    I believe so.

14        Q.    Is that a document that would have been

15   signed?

16        A.    I can't recall if it was signed or not.

17        Q.    Who would have drafted that?

18        A.    Doug Holthaus.

19        Q.    And you provided it to Mike Herman?

20        A.    Provided it to Pat, copying Mike.

21        Q.    Why would you be providing all of this to

22   Mr. Herman?

23        A.    As I said, Mike was consulting and I was

24   keeping him informed.

25        Q.    Was there any type of consulting

E. Ortiz - by Ms. DiVittore

87

1    agreement in place?

2        A.    Nope.  It was just a friendship

3    consulting agreement.

4        Q.    So he did all this for free?

5        A.    Absolutely.  Mike has not been paid a

6    dime from IFM.

7        Q.    Have you been paid other than the amounts

8    you've talked about --

9        A.    I'd be paid today if it was --

10           MR. BORDEN:  Just let her finish.  Why

11    don't you finish your question.

12        Q.    Other than the amounts you talked about,

13    approximately 30 to $40,000.

14        A.    That's it.

15        Q.    Was your wife, as the owner, paid any

16    funds?

17        A.    None.

18        Q.    And you're also forwarding an e-mail from

19    Doug Holthaus to you, Mr. Herman and Patrick

20    Donahue; is that right?

21        A.    I believe so.

22        Q.    Michael Herman was not an IFM employee?

23        A.    Not an IFM employee.

24        Q.    Not an officer?

25        A.    Not an officer.

E. Ortiz - by Ms. DiVittore

88

1     Q.    But he's copied on --

2     A.    He's copied on all these e-mails.

3     Q.    Including e-mail from your counsel?

4     A.    Including e-mail from my counsel.

5     Q.    Who is Tatiana, T-A-T-I-A-N-A, Holthaus?

6     A.    I believe that's Doug's daughter.

7     Q.    Do you know why she is copied?

8     A.    I -- no idea.  Doug copied her.

9     Q.    And the e-mail from Attorney Holthaus

10 says it includes a Delaware certificate of formation

11 of IF Mail.  Do you see that?

12    A.    It does.  But as I stated earlier, we

13 never finalized a Delaware certificate for IFM.

14    Q.    And your e-mail at the top to Patrick

15 copying Mike says, "We discussed being partners and

16 that is our intention."

17         Who do you mean would be partners?

18    A.    Pat.

19    Q.    Not Mr. Herman?

20    A.    No.  Pat.

21    Q.    Are you familiar with a company, DA

22 Marketing?

23    A.    Don't understand the relevance of that.

24         MR. BERARDINELLI:  I'm sorry, could I

25 have the last question back?

E. Ortiz - by Ms. DiVittore

92

1              MR. BORDEN:  Okay.

2    BY MS. DIVITTORE:

3         Q.    Mr. Ortiz, what's a pro forma?

4         A.    It's a projected business plan.

5         Q.    And did you and your team at IFM work on

6    a pro forma?

7         A.    Yes, we did.

8              MR. BERARDINELLI:  Object to the form.

9         Q.    And is Exhibit 23 a January 4, 2017,

10   e-mail at the top from you to Michael Herman

11   concerning the IFM pro forma and business overview?

12        A.    Uh-huh.

13        Q.    And attached to that is the pro forma and

14   business plan; is that correct?

15        A.    Correct.

16        Q.    And who drifted the pro forma and

17   business plan?

18        A.    I did.

19        Q.    And your e-mail indicates that "Stephanie

20   is president of her business DA Marketing, which we

21   have closed.  She will be handling all admin and

22   client stuff for us."

23        A.    Correct.

24        Q.    Then "the clients listed fall into two

25   buckets."  Do you see that?

E. Ortiz - by Ms. DiVittore

93

1    A.    Yes, they do.

2    Q.    That's Sandvik, S-A-N-D-V-I-K?

3    A.    Yep.  Yes.

4    Q.    FMC?

5    A.    Yes.

6    Q.    And these are two clients transferring

7  from DA Marketing.

8    A.    DA Fulfillment.  They were not mail

9  customers, they're fulfillment customers.

10    Q.    But your e-mail says DA Marketing.

11    A.    Yes, that was the name of the company.

12  But they did fulfillment work with DA Marketing

13  not --

14    Q.    Did DA Marketing ever do any mail work?

15    A.    Only one customer for --

16          MR. BORDEN:  Just let her finish.

17    Q.    Did DA Marketing ever do any mail work

18  for Sandvik or FMC?

19    A.    None.

20    Q.    And it says, "Production Solutions and

21  Image Mark are the two clients that Pat has quotes

22  with that he says we have work."

23    A.    Correct.  That's what it says.

24    Q.    Is that correct?  So as early as

25  January 4, 2017, you had quotes with Production

E. Ortiz - by Ms. DiVittore

94

1    Solutions and Image Mark?

2        A.    Pat said we did.

3        Q.    Okay.  And that was for direct mail work,

4    correct?

5        A.    That was for mail on the machine.

6        Q.    And your last sentence, "Lastly, we need

7    to discuss PL as we need to develop cash flow model

8    that shows how Sofitel and we get cash."

9              Do you see that?

10       A.    It does.

11       Q.    What do you mean by PL?

12       A.    Profit and loss.

13       Q.    What do you mean by "develop cash flow

14   model that shows how Sofitel and we get cash"?

15       A.    It refers to the arrangement that Doug

16   was negotiating or negotiated with Sofitel for us

17   for the royalty agreement.

18       Q.    And did you at this point have an idea

19   of, provided you get the equipment working, what

20   portion of the business would be fulfillment and

21   what portion would be mail?

22       A.    So -- I'm going to answer your question.

23   If you refer to the pro forma, it shows you that

24   Sandvik and FMC were 170 grand worth of business and

25   the rest was coming from so-called Pat.

E. Ortiz - by Ms. DiVittore

95

1        Q.      Pat?

2        A.      Patrick.  Pat.  That never materialized.

3        Q.      But when you formed the business, you

4    anticipated based on --

5        A.      On Pat's statement that he had these

6    opportunities that never materialized.

7        Q.      Okay.  And the pro forma indicates, like

8    you said, $175,000 of revenue from fulfillment --

9        A.      From fulfillment.

10       Q.      -- correct?  And then $2,250,000 from

11   Production Solutions?

12       A.      Correct.

13       Q.      And $1,300,000 from Image Mark.

14       A.      Correct.

15       Q.      And Production Solutions and Image Mark

16   were solely mail.

17       A.      Solely mail.

18       Q.      Are you familiar with a company EdgeMark?

19       A.      I know the name and I know the company.

20       Q.      Do you know what they do?

21       A.      I believe they're a marketing agency.

22       Q.      Do you know whether they engage in any

23   direct mail services?

24       A.      I believe they purchase direct mail

25   services from suppliers.

E. Ortiz - by Ms. DiVittore

96

1        Q.     Were they identified as a potential mail

2    client for IFM?

3        A.     Patrick identified them as one.

4        Q.     At some point ANRO notified you that they

5    weren't going to work with you; is that right?

6        A.     Correct.

7        Q.     Do you know why?

8        A.     ANRO had too many operating problems

9    internally to devote the resources needed to partner

10   with us.

11       Q.     When did that -- when did the

12   negotiations with ANRO end?

13       A.     Sometime in the first quarter of '17.

14       Q.     So it was before the machine was even

15   running?

16       A.     Absolutely.

17       Q.     Do you know if there were quotes for work

18   from EdgeMark?

19              MR. BERARDINELLI:  I'm sorry, what was

20   the question?

21       Q.     Do you know if there were quotes for work

22   from EdgeMark?

23              MR. BERARDINELLI:  Thank you.

24       A.     There were no quotes from EdgeMark,

25   Production Solutions, or anyone else for the

E. Ortiz - by Ms. DiVittore

97

1    machine.  Pat said there were, but they never were.

2         Q.    Do you know if Patrick, on behalf of IFM,

3    contacted EdgeMark regarding potential work?

4         A.    I believe he did.

5         Q.    And that would have been mail work, not

6    fulfillment?

7         A.    That would have been mail work.

8         Q.    Do you know when he would have contacted

9    them?

10        A.    Sometime in the -- early '17 is my guess.

11        Q.    Are you familiar with a company Mutual of

12   Omaha?

13        A.    I am.

14        Q.    Were they identified as a potential mail

15   client for IFM?

16        A.    They were.

17        Q.    Did you have any involvement or

18   discussions with them?

19        A.    I had discussions with Pat.  I never

20   discussed anything with Mutual of Omaha directly.

21        Q.    Do you know whether IFM quoted any jobs

22   for Mutual of Omaha?

23        A.    IFM provided estimates, quotes, based on

24   theoretical concepts that Mutual of Omaha was

25   discussing with Pat.

E. Ortiz - by Ms. DiVittore

98

1    Q.    And that was direct mail work again?

2    A.    Direct mail work.

3    Q.    Do you know the time period that Patrick

4    would have been talking to Mutual of Omaha?

5    A.    Second half of '17.

6    Q.    When Patrick -- when you agreed to bring

7    him on board and become a part of IFM, you testified

8    that he did the engineering and design for the

9    machine?

10    A.    Correct.

11    Q.    Did he have prior experience in the

12    direct mail business?

13    A.    Pat has an extensive history in the

14    direct mail business.

15    Q.    In addition to the technology, did you

16    think or were there representations that he had

17    contacts that would help you find direct mail

18    customers?

19    A.    My perception at the time was Pat's 50

20    years in the business should have enabled him to

21    have been a successful salesperson.

22    Q.    Is that why a portion of his compensation

23    was based on commission?

24    A.    Correct.

25    Q.    So if he landed a direct mail client,

E. Ortiz - by Ms. DiVittore

99

1    he'd get some type of --

2        A.    He had a commission plan.

3                    * * *

4        (MO Deposition Exhibit 24 was marked for

5                identification.)

6                    * * *

7        Q.    Show you what we've marked as Exhibit 24.

8        A.    (Witness reviewing.)

9        Q.    Do you recognize this as an e-mail dated

10   March 8, 2017, from you to Mr. Herman?

11       A.    I do.

12       Q.    He's talking about Metaverse,

13   M-E-T-A-V-E-R-S-E.

14       A.    Yes.

15       Q.    And it looks like there was a PDF

16   attached that we don't have; is that right?  Well,

17   strike that.

18   It looks like there is a PDF attached to that

19   e-mail, if you look at the subject line at the top.

20       A.    Yeah.  I agree.

21       Q.    What is Metaverse?

22       A.    An art company.

23       Q.    And this was part of the documents that

24   your counsel forwarded as involved?

25       A.    It was just part of the -- all the

E. Ortiz - by Ms. DiVittore

100

1    e-mails that we supplied.

2        Q.    Do you know who Stuart Rose is?

3        A.    A broker for an investment banking

4    company that helps buy and sell companies.

5        Q.    And were you approaching Metaverse for

6    work for IFM?

7        A.    No.   Metaverse was an art company, an

8    e-commerce art company.

9        Q.    So what was their role?

10       A.    We were looking to acquire the company.

11       Q.    So the bottom e-mail from you to

12   Mr. Rose, "Here is proof of part of the funding."

13       A.    Uh-huh.

14       Q.    "We will provide additional proof of

15   funds from Brendon and banking source when needed."

16             So you're showing him potential funding

17   to acquire this company?

18       A.    Correct.

19       Q.    This letter is from her attorney who

20   handles the monies for Sofitel LMG.

21       A.    Uh-huh -- correct.

22       Q.    So you were providing correspondence from

23   Attorney Holthaus --

24       A.    I believe so.

25       Q.    -- indicating that he handles the money

E. Ortiz - by Ms. DiVittore

101

1    for Sofitel?

2         A.    Sofitel, yes.

3         Q.    What is LMG?

4         A.    That's Logan Marketing Group, that's my

5    e-mail.

6         Q.    So Attorney Holthaus is also involved

7    with LMG?

8         A.    Attorney Holthaus did no work for LMG

9    other than what's referred to in an e-mail about

10   acquiring a company.

11        Q.    Did IFM, to your knowledge, Mr. Donahue

12   (sic), I suppose, identify Chubb as a potential mail

13   client?

14        A.    I believe so.  I mean, Pat had multiple

15   ideas of clients.

16        Q.    Did the machine ever get up and running?

17        A.    The machine ran two, three, four days in

18   test periods and would break down consistently.

19        Q.    Did you successfully obtain any direct

20   mail clients?

21        A.    Not a one.

22        Q.    And would you agree that you became

23   concerned with the ability of the business to

24   survive?

25        A.    Well, I was concerned with the ability of

E. Ortiz - by Ms. DiVittore

102

1    our getting the machine to operate consistently so

2    that we would not fail with the customer.

3        Q.    Were you operating the fulfillment

4    portion?

5        A.    We were.

6        Q.    Were you obtaining revenue from that?

7        A.    A couple hundred thousand dollars a year.

8        Q.    What did -- MJ Ortiz is your son; is that

9    right?

10       A.    That's correct.

11       Q.    What did MJ do for the business?

12       A.    He ran the fulfillment business.

13       Q.    And at some point IFM hired Michael R.

14   Herman?

15       A.    Correct.

16       Q.    And if I refer to him as Mikey, you'll

17   understand what I mean?

18       A.    I do.

19       Q.    And that's Mr. Herman, party in this

20   case, it's his son?

21       A.    Correct.

22       Q.    And how did hiring Mikey come about?

23       A.    Mike called me and said he was having a

24   discussion with Mikey about joining the firm because

25   Mikey was unhappy at his current employment and Mike

E. Ortiz - by Ms. DiVittore

103

1    wanted to give Mikey an opportunity.

2         Q.    Did you talk to Mikey before he was

3    hired?

4         A.    I did.

5         Q.    About IFM?

6         A.    About IFM.

7         Q.    Do you recall approximately when?

8         A.    Honestly, I don't remember the date.  I

9    know it was before he actually started.

10        Q.    And what did you talk to him about?

11        A.    About what his opportunity was at IFM.

12        Q.    Because at this point you thought you'd

13   get the machine running and do well?

14        A.    We thought that we'd get the machine

15   running and we thought that Mikey could help

16   facilitate that.

17        Q.    And you also had employees, David Stubee,

18   S-T-U-B-E-E.

19        A.    Correct.

20        Q.    What did David do?

21        A.    Fulfillment work.

22        Q.    Evan Liss, L-I-S-S?

23        A.    Fulfillment work.

24        Q.    And Jason Jaffre, J-A-F-F-R-E?

25        A.    Mechanic.

104

1      Q.     For the direct mail side?

2      A.     For the machine.  To get the machine

3   running.

4             MR. BERARDINELLI:  Spell the last one,

5   Stephanie, I'm sorry.

6             MS. DIVITTORE:  J-A-F-F-R-E.

7             MR. BERARDINELLI:  Thank you.

8      Q.     And by fall of 2017 is it fair to say you

9   were very unhappy with Mr. Donahue and the mail

10  business?

11     A.     That's an understatement.

12     Q.     Show you what we've marked as Exhibit 25.

13                        * * *

14       (MO Deposition Exhibit 25 was marked for

15                    identification.)

16                        * * *

17     A.     (Witness reviewing.)

18     Q.     Do you recognize that as an October 18,

19  2017, e-mail from you to Mr. Herman?

20     A.     I do.

21     Q.     And it lists your concerns with Mr.

22  Donahue?

23     A.     It does.

24     Q.     And without reading the document, can you

25  tell us what were your concerns at that point?

E. Ortiz - by Ms. DiVittore

105

1      A.      Without reading the document and without

2    being sarcastic about it, pretty much what it says

3    in the document.  I thought that Pat was just

4    useless.

5      Q.      And at some point you terminated him?

6      A.      We did.

7      Q.      Do you recall approximately when that

8    was?

9      A.      May or June of this year.

10      Q.      IFM continued to operate until what --

11    when?

12      A.      IFM has been in business, okay, doing the

13    fulfillment work and doing no mail business all

14    along.

15      Q.      So IFM is still operating?

16      A.      No.  It's not operating as an entity,

17    okay, but it was in business.  It was basically a

18    shuttered entity, that has not been closed down with

19    the state.  If that's what you're referring to, or

20    anything like that.

21      Q.      When did it stop doing fulfillment work?

22      A.      IFM stopped generating any revenues March

23    or April of this year.

24      Q.      Were all -- all of the employees were let

25    go?

E. Ortiz - by Ms. DiVittore

106

1        A.     Some of them were transferred to our
2    other business.
3        Q.     Which one?
4        A.     Our other business.
5        Q.     Which business?
6        A.     The Logan Marketing Group businesses.
7        Q.     Does Logan Marketing Group itself operate
8    a business?
9        A.     Logan Marketing Group is a holding
10   company that owns two other entities today.
11       Q.     And which entities?
12       A.     IBS and ClientLink.
13       Q.     ClientLink is where we went for your
14   wife's deposition; is that right?
15       A.     Correct.
16       Q.     And ClientLink does mail or fulfillment
17   or --
18       A.     Mostly fulfillment.  A little mail.
19       Q.     And IBS is located where?
20       A.     King of Prussia.
21       Q.     And does that company do both fulfillment
22   and mail?
23       A.     Just does printing.  It's a printing
24   company.
25       Q.     So it doesn't do any direct mail

E. Ortiz - by Ms. DiVittore

107

1    services?

2        A.    It does -- prints products for the direct

3    mail business.

4        Q.    So that would be like an ANRO to an IFM?

5            MR. BERARDINELLI:  Object to the form.

6            MR. BORDEN:  And I've given you a lot of

7    leeway but --

8            THE WITNESS:  And I'm trying to --

9            MR. BORDEN:  Yeah, I understand, and I

10   appreciate you are.  But these two, what you've

11   asked about in the last few minutes, have nothing to

12   do with this lawsuit.

13           MS. DIVITTORE:  He just testified that

14   all of the employees from IFM, which clearly has

15   something to do with the lawsuit, were transferred.

16   So I'm trying to understand --

17       A.    They were terminated at IFM and hired at

18   ClientLink.

19           MR. BORDEN:  Yeah, when IFM closed down.

20   But he's given you that testimony, but I don't think

21   we're prepared to have that go any further.

22           MS. DIVITTORE:  Okay.  And I'll just note

23   that we will likely raise it with the Judge, and if

24   we have to come back here, the same argument we had

25   with Marie Ortiz's deposition.

E. Ortiz - by Ms. DiVittore

108

1          MR. BORDEN:  Understood.

2     Q.    And you're aware that you testified

3 earlier that Mr. Herman is involved or has some

4 involvement with a business that owns an airplane?

5     A.    Mr. Herman owns an airplane.

6     Q.    You've been on that?

7     A.    I've been on the airplane.

8     Q.    And I believe it was your testimony that

9 Mr. Herman did provide some services for what would

10 become IFM?

11    A.    Correct.

12    Q.    And the airplane.

13    A.    And the airplane, yes.

14    Q.    Can you tell me about that?

15          MR. BORDEN:  Wait.

16    A.    He flew us to --

17          MR. BORDEN:  What's the -- I'm sorry, but

18 I don't understand the question.  What is the

19 question?

20          I just ask you to rephrase it.  Not

21 cutting you off, but I just ask you that we have a

22 clear question.

23          MS. DIVITTORE:  Are you objecting to the

24 form but he could answer?

25          MR. BERARDINELLI:  Can you read the

E. Ortiz - by Ms. DiVittore

                                                        109

1    question back?

2                          * * *

3         (Whereupon, reporter read pending question.)

4                          * * *

5              MR. BORDEN:  I don't understand what you

6    mean.

7              MS. DIVITTORE:  Tell me what Mr. Herman

8    and his airplane did for IFM.  I mean, I'll object

9    to your objections because we've again --

10             MR. BORDEN:  What the airplane did?  Is

11   that really your question?

12             MS. DIVITTORE:  Attorney Borden, I'm

13   going to ask that you stop.  If you want to object

14   to the form, he can see whether or not he can answer

15   it, but your speaking objections simply aren't

16   acceptable.

17             MR. BORDEN:  And I'm sorry, if a

18   question --

19             MS. DIVITTORE:  I will withdraw the

20   question and start over, but object to the form is

21   all that we've stipulated to.

22        Q.   Mr. Ortiz, you involved Michael Herman

23   and his airplane when you were working on starting

24   IFM, correct?

25        A.   Correct.

E. Ortiz - by Ms. DiVittore

110

1      Q.    Tell us about what Michael Herman and his

2  airplane did for you in forming IFM.

3            MR. BORDEN:  Objection.  Go ahead.

4      A.    He flew us to Fry Communications to take

5  a look at the machine.

6      Q.    Where is Fry located?

7      A.    Mechanicsburg, or something like that, in

8  Pennsylvania.

9      Q.    And do you recall how many trips there

10 were?

11     A.    Twice.

12     Q.    And this was before the business was

13 formed; is that right?

14     A.    Correct.

15     Q.    But you would agree to compensate him for

16 use of the airplane?

17     A.    We agreed after the fact.

18     Q.    There were no discussions before?

19     A.    No.

20     Q.    What were the terms of your agreement

21 about compensation for use of the plane?

22     A.    There wasn't any formal agreement.  I

23 know the plane costs a lot of money to fly, but it

24 was an issue of convenience so we covered the costs.

25     Q.    The plane is typically kept in

E. Ortiz - by Ms. DiVittore

111

1    California; is that right?

2          A.    You'll have to ask Michael where he keeps

3    it.

4          Q.    When you went to visit Fry, where -- did

5    he pick you up?

6          A.    He picked me up.

7          Q.    Did anybody else go with you?

8          A.    Pat.

9          Q.    The three of you?

10         A.    Yeah, the three of us.

11         Q.    And where did he pick you up?

12         A.    Trenton/Mercer.

13         Q.    In New Jersey?

14         A.    Uh-huh.

15         Q.    And flew you to Mechanicsburg?

16         A.    Yep.

17         Q.    You looked at the machine?

18         A.    Yep.  Correct.

19         Q.    And then he flew you back to New Jersey?

20         A.    Correct.

21         Q.    Second trip was the same?

22         A.    Same thing.

23         Q.    And you don't know where Mr. Herman

24    brought the plane from?

25         A.    No, I don't.

E. Ortiz - by Ms. DiVittore

112

1          MR. BERARDINELLI:  Could we take five

2   minutes, Stephanie?

3          MS. DIVITTORE:  Sure.

4                    * * *

5      (Whereupon, a brief recess was taken.)

6                    * * *

7      (MO Deposition Exhibit 26 was marked for

8                 identification.)

9                    * * *

10  BY MS. DIVITTORE:

11      Q.    I will show you, Mr. Ortiz, what we've

12  marked as Ortiz Exhibit 26.

13      A.    Okay.

14      Q.    Do you recognize this as a January 18,

15  2017, e-mail from Susan Bender to you at your Logan

16  Marketing Group e-mail address?

17      A.    Yes, I do.

18      Q.    And Ms. Bender is forwarding an invoice

19  for use of the airplane?

20      A.    Correct.

21      Q.    And she indicates that she removed the

22  consulting wording since it was just for expense

23  reimbursement.  Do you know anything about that?

24      A.    Yes.

25      Q.    Can you tell us?

E. Ortiz - by Ms. DiVittore

113

1      A.      The first one was written incorrectly
2   because it referred to as consulting when what we
3   were doing was covering Mike's expense of the
4   airplane.
5      Q.      And if you look at the second page, was
6   that the invoice?
7      A.      That was the total of the invoice.
8      Q.      It was dated January 3rd of 2017?
9      A.      I believe so.
10      Q.      And it was Michael Herman at 3402 Gage,
11   G-A-G-E, Place, San Diego, California to Manny Ortiz
12   at IF Mail, LLC; is that correct?
13      A.      That's correct.
14      Q.      And the total amount of the invoice is
15   $27,865.13?
16      A.      Correct.
17      Q.      And this indicates -- there appears that
18   there may have been three trips.  Is it possible
19   that there were three trips?
20      A.      It could have been.
21      Q.      And this invoice was paid by IFM?
22      A.      $25,000.
23      Q.      And that was with the funds from Sofitel?
24      A.      Correct.
25      Q.      Did IFM also pay expenses for the

E. Ortiz - by Ms. DiVittore

114

1    airplane hangar; do you know?

2        A.    Yes.

3        Q.    Can you tell us about that?

4        A.    IFM covered the hangar costs when Mike

5    needed a hangar cost in New Jersey.

6        Q.    Was that for the -- strike that.

7              Private planes aren't my thing.  So

8    would IFM -- when Mr. Herman would fly to New Jersey

9    to meet with you, he'd have to pay to have his plane

10   at the airport?

11       A.    To hangar it at the airport.

12       Q.    And is that just for the in and out when

13   he was picking up -- picking you up to go to Fry, or

14   was that other times when he would come to New

15   Jersey?

16       A.    Whenever he came to Jersey.

17       Q.    And was that a regular monthly expense,

18   or did they invoice for each time?

19       A.    A monthly expense.

20       Q.    Do you know how much it was?

21       A.    $3,500, 3,600, something like that.

22       Q.    Was he coming to New Jersey solely to see

23   you?

24       A.    Mike had business in New York, so when he

25   would come east, he would do both.

E. Ortiz - by Ms. DiVittore

115

1     Q.    Why did IFM agree to pay for the hangar

2  costs for --

3     A.    Because IFM couldn't afford to continue

4  paying $25,000 for the use of the plane, so it was

5  more economical for the company to pay 30-some

6  hundred dollars a month for a few months than to pay

7  the costs of utilizing that airplane.

8     Q.    Were there other private flights?

9     A.    We've used the plane other times.

10    Q.    Other than Fry Communications?

11    A.    Other than Fry Communications.

12    Q.    Where did you go and when?

13    A.    The dates -- I can't recall all of them,

14  but we've gone to Detroit, we've gone to Charlotte,

15  we've come here to Pittsburgh.

16    Q.    Is that related to the IFM business?

17    A.    All related to IFM business.

18    Q.    So other than the $25,000 that you paid

19  towards the invoice, the only other money to Mr.

20  Herman was -- strike that.

21          The only other money that was paid for

22  or on behalf of Mr. Herman or his business was

23  hangar reimbursement?

24          MR. BERARDINELLI:  Object to form.

25    A.    Hangar reimbursement.

E. Ortiz - by Ms. DiVittore

116

1     Q.     What about fuel or maintenance for the

2  airplane?

3     A.     None.  That's what the hangar deal was

4  about.

5     Q.     And do you know how IFM paid those

6  expenses?

7     A.     By check to the entity that owns the

8  hangar.

9     Q.     And you said IFM stopped operating in

10  March or April of 2018?

11     A.     Correct.

12     Q.     Did it stop paying the hangar expenses at

13  that time?

14     A.     No, the hangar expenses are still

15  covered.

16     Q.     Is additional funding coming in to IFM?

17     A.     Today, no.

18     Q.     Since?

19     A.     Not from Sofitel, no.

20     Q.     IFM has other funding sources?

21     A.     IFM has -- had, because it's been

22  transferred over -- had the two fulfillment

23  customers.  One left.  So it has one left.

24     Q.     I thought you told me IFM was no longer

25  operating.

E. Ortiz - by Ms. DiVittore

117

1      A.    It's not.  It's moved into the Logan, the

2  client -- we terminated IFM, we moved the one

3  fulfillment customer into ClientLink.

4      Q.    So how does IFM have money to pay the

5  hangar expenses?

6            MR. BERARDINELLI:  Object to form.

7            THE WITNESS:  Excuse me?

8            MR. BERARDINELLI:  I objected to the

9  form, but you can answer.

10     A.    There was money in the account and we've

11  paid it, and now -- eventually it's going to have to

12  be paid by one of the other entities if we continue

13  with this agreement.

14     Q.    The agreement to pay the hangar expenses?

15     A.    Correct.

16     Q.    Is it in writing?

17     A.    No.

18     Q.    Do you know, is there a lease for the

19  hangar?

20     A.    Honestly, I don't recall.

21            MS. DIVITTORE:  David, I have two brief

22  areas of questioning; one concerns the recent

23  production that is attorneys' eyes only.

24            MR. BERARDINELLI:  That's all right.

25            Are we up to 27?

E. Ortiz - by Ms. DiVittore

118

1          MS. DIVITTORE:  We are.  Can I just use

2     this for a minute?  She missed a copy.

3          MR. BERARDINELLI:  Do you want me to have

4     Marquee make one?

5          MS. DIVITTORE:  Do you mind?  I can ask

6     her.

7          MR. BERARDINELLI:  Yeah.

8                    * * *

9          (Whereupon, a brief recess was taken.)

10                   * * *

11    (MO Deposition Exhibit 27 - Attorney's Eyes Only was

12              marked for identification.)

13                   * * *

14    BY MS. DIVITTORE:

15        Q.   I'll show you what we've marked MO

16    Exhibit 27.  And for the record, this is marked

17    attorneys' eyes only.

18        A.   That's -- kind of just reference I never

19    saw that before.

20        Q.   That was my question.  I'll represent

21    that Michael Herman's counsel provided this to us

22    Wednesday or Thursday of this week as a supplemental

23    document production.  And my question to you is,

24    have you ever seen this or similar e-mail

25    correspondence by and among Tatiana Holthaus and

E. Ortiz - by Ms. DiVittore

119

1    Doug Holthaus --

2              MR. BERARDINELLI:  Object to the form.

3              MR. BORDEN:  Object to the form.

4       Q.    I wasn't done -- regarding a joint

5    venture agreement concerning IFM?

6              MR. BORDEN:  Object to the form.

7              MR. BERARDINELLI:  Object to the form.

8       A.    So here's what I know.  I've never seen

9    this before in my life.  Okay?

10      Q.    When did Attorney Holthaus pass away?

11      A.    Can I ask for help here?

12      Q.    If you recall.  If you don't recall --

13      A.    I think it was late '17.

14      Q.    And you've indicated that you never saw

15   the MH777?

16      A.    This document.

17      Q.    But you did testify that there was going

18   to be some type of agreement between IFM and

19   Sofitel; is that right?

20      A.    Correct.

21      Q.    Did you ever see one?

22      A.    No.  I had conversations with Doug about

23   the nature of a royalty agreement that we could

24   enter into with Sofitel.  I've -- this is the first

25   document concerning any kind of agreement, royalty

E. Ortiz - by Ms. DiVittore

120

1    or otherwise, I've ever seen.

2        Q.    Since Mr. -- or Attorney Holthaus's death

3    has his office or his assistant or his relatives

4    been in touch with you concerning the agreement or

5    relationship between IFM and Sofitel?

6        A.    No.

7        Q.    So as far as you're aware, there's no

8    obligation to repay any of the funds that Sofitel

9    advanced to IFM?

10            MR. BERARDINELLI:   Object to the form.

11       A.    I can't answer your question because

12   the -- the way you worded it.

13       Q.    You indicated to me that the relationship

14   was a royalty agreement?

15       A.    Correct.

16       Q.    So if IFM made money, you would owe some

17   type of royalty to Sofitel.

18       A.    Correct.

19       Q.    Absent the royalty payments there was no

20   obligation to repay the money that Sofitel invested

21   in IFM.

22       A.    I don't agree with that.

23       Q.    I'm sorry?

24       A.    I don't agree with that.  My perception

25   is that IFM owes Sofitel for the money that Sofitel

E. Ortiz - by Ms. DiVittore

121

1    advanced.  What I'm unsure of is in what form it

2    will be done since the agreements were never

3    completed.

4         Q.    How would IFM repay Sofitel?

5         A.    Through running the technology in a

6    royalty agreement.  The IFM machine will eventually

7    be run and then Sofitel will get paid.  What's

8    unsure of is when and how the nature of that

9    agreement will be finalized.

10        Q.    Where is the IFM machine now?

11        A.    In the warehouse.

12        Q.    Which warehouse?

13        A.    In the ClientLink warehouse.

14        Q.    Did ClientLink purchase the machine from

15   IFM?

16        A.    No, it's just being stored there.

17        Q.    But it's -- is it your intention to try

18   and get the machine functioning and continue to

19   operate as IFM?

20        A.    My intention is to get the machine

21   functioning at some point, and that's not in the

22   near future.  The machine is dismantled and in many,

23   many pieces.  And it will take a significant effort

24   to put it back together and get it fixed correctly

25   so it will run.

E. Ortiz - by Ms. DiVittore

122

1     Q.     You don't have any intention to continue
2  operating as IFM; do you?
3     A.     None whatsoever.
4     Q.     So who's going to operate the machine if
5  you get it fixed?
6     A.     ClientLink.  It will purchase the
7  machine.
8     Q.     Do you recall how much IFM paid for the
9  machine?
10    A.     I do.
11    Q.     How much was that?
12    A.     $35,000.
13    Q.     Are you currently -- strike that.
14           As we sit here today -- strike that.
15           ClientLink is providing direct mail
16  services, correct?
17    A.     ClientLink is providing direct mail
18  services in relation to its fulfillment business.
19  Some of the work requires some mail pieces to be
20  produced.  It's not in the same category of direct
21  mail services as NAC is.
22    Q.     Would you agree with me that based on
23  your relationship with Mr. Herman, your past
24  experience with NAC, relationship with Rob Herman,
25  that you're familiar with the direct mail business

E. Ortiz - by Mr. Berardinelli

130

1   agreement with Mr. Donahue.  Do you recall that?

2       A.   Yep.  Yes.

3       Q.   And I think you said something like this

4   is about Pat or only about Pat; what were you

5   referring to?

6       A.   Where it says I apologize for the

7   document, the first version of the employment

8   agreement was not what we had talked to Pat about so

9   we had to get Doug to redo it.

10      Q.   You use the term partners, plural, in

11  here several times.  Maybe not officially on paper.

12  But who were the partners in your mind in IFM?

13      A.   Partners at IFM, owned by Marie, Pat,

14  Mike, myself.

15      Q.   And if IFM had been wildly successful,

16  would Mr. Herman have shared economically in that

17  success?

18      A.   Absolutely.

19      Q.   Exhibit 18 -- and we probably should pull

20  out 11, which are the bank records with it.

21      A.   I have 18 here.

22           MR. BORDEN:  Here's 11.

23      A.   Okay.

24      Q.   Have you had a chance to look over that,

25  Mr. Ortiz?

E. Ortiz - by Mr. Berardinelli

131

1      A.     Yeah.

2      Q.     In the top e-mail you write, "Yes, we can

3  account for it.  We will have him wire us money."

4             Who is him?

5      A.     Doug.

6      Q.     And then if we could turn to page 60 of

7  Exhibit 11 -- I'm sorry, not 60, bear with me one

8  second.  Page 48 of Exhibit 11.

9             First of all, what's the date of the

10  e-mail string, or at least the top two in

11  Exhibit 18?

12      A.     September 1st.

13      Q.     And on Exhibit 11 page 48 is there a wire

14  transfer?

15      A.     September 6th for 50 grand.

16      Q.     And based on the "him" in this, that

17  would have been Doug wiring that money?

18      A.     Correct.

19      Q.     Page 17 -- or I'm sorry -- Exhibit 17,

20  what's the date on Exhibit 17, Mr. Ortiz?

21      A.     June 23rd.

22      Q.     And it's an e-mail between you and Mike?

23      A.     Me and Mike.

24      Q.     And I believe the insinuation was that

25  you were asking Mike personally for money; were you

E. Ortiz - by Mr. Berardinelli

132

1    asking Mike personally for money?

2         A.    No, I was just referring to the money we

3    would be getting from Doug.

4         Q.    Money from Sofitel?

5         A.    From Sofitel.

6         Q.    What's the date of this e-mail?

7         A.    June 23rd.

8         Q.    Turn to page 60 of Exhibit 11.  Is there

9    a wire to IFM four days later for the $50,000?

10        A.    Well, this -- there's one here on

11   June 27th for 50 grand.

12        Q.    Exhibit 15, May 24, 2017, e-mail between

13   you and Mr. Herman, right?

14        A.    Uh-huh.

15        Q.    Were you asking Mr. Herman personally for

16   money, or some other source?

17        A.    No.  Again, it's my communicating with

18   Mike about the kind of money we were going to get

19   from -- get Doug to send from Sofitel.

20        Q.    And if you turn to page 66 of Exhibit 11,

21   the U.S. Bank records...

22        A.    Yep.

23        Q.    On May 26th is there a wire from the

24   Sofitel account to IFM?

25        A.    50,000.

E. Ortiz - by MS. DiVittore

133

1        Q.     Other than the 15,000 wire transfer

2    record we saw from one of Mr. Herman's accounts to

3    IFM, did he ever provide any money that you

4    understood to be personal funds to IFM?

5        A.     None other than the 15 grand.

6               MR. BERARDINELLI:  That's all I have.

7    Thanks, Mr. Ortiz.

8               MS. DIVITTORE:  I have a couple

9    follow-up.

10                          *  *  *

11                       <u>EXAMINATION</u>

12   <u>BY MS. DIVITTORE:</u>

13       Q.     You testified just now in response to

14   Mr. Berardinelli that when you're referring to

15   partners in the IFM business, you were referring to

16   yourself, Patrick Donahue, and Mike Herman; is that

17   correct?

18       A.     Correct.

19       Q.     What was the plan for the three of you to

20   share in profits as partners?

21       A.     Pat had an employment agreement, as I've

22   stated.  I think you have a copy of it here

23   somewhere.  So that's self-explanatory.  Mike and I

24   were going to split if there was any income, any

25   real income out of the company.

E. Ortiz - by MS. DiVittore

134

1      Q.      How would you and -- how would Mr. Herman

2  split income if he was not an owner, officer or

3  employee?

4      A.      Because of Mike's role as a consultant

5  that was unpaid, at some point the perception was if

6  we had any value in this business, he would get a

7  piece.

8      Q.      So Patrick Donahue's partner reward or

9  reimbursement would be through his commissions?

10     A.      Through his commissions.

11     Q.      But then you and Mr. Herman would somehow

12  split profits?

13     A.      Would split some profits, yes.

14     Q.      Would this have been spelled out in the

15  operating agreement?

16     A.      I'd have to review the operating

17  agreement to answer you in some form of affirmative.

18  So I don't recall.

19     Q.      But you and Mr. Herman had a verbal

20  agreement to this arrangement?

21     A.      We had an understanding.

22     Q.      You testified, I believe, that IFM

23  reimbursed Mr. Herman $25,000 of the 27,000 and some

24  change invoice for use of the airplane; is that

25  correct?

135

1      A.      Correct.

2      Q.      Is it possible that that money came from

3  Marie Ortiz and not IFM?

4      A.      Not possible -- I don't think so.

5              MR. BERARDINELLI:  I think you've

6  produced the check, Stephanie, in your production.

7              MS. DIVITTORE:  Okay.  Nothing further.

8              MR. BERARDINELLI:  Thanks, Manny.

9              THE WITNESS:  Oh, thank God.

10             (Signature not waived.)

11             (Whereupon, the above-entitled matter was

12  concluded at 12:03 p.m.)

13                      -----

14

15

16

17

18

19

20

21

22

23

24

25